468 F.2d 757
 McCORMICK & COMPANY, INCORPORATED, Appellee,
v.
Earl L. CHILDERS, Appellant.
McCORMICK & COMPANY, INCORPORATED, Appellant,
v.
BEDFORD INDUSTRIES INCORPORATED, a body corporate of the
Commonwealth of Virginia, successor to and formerly known as
Childers Foods, Incorporated, a body corporate of the
Commonwealth of Virginia, et al., Appellees.
 Nos. 71-2215, 71-2216.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 9, 1972.
Decided Oct. 23, 1972.
 
 Paul R. Connolly and J. Alan Galbraith, Washington, D. C. (Williams, Connolly & Califano, Washington, D. C., on brief), for Earl L. Childers, Bedford Industries, Inc., and others.
 Franklin G. Allen, Baltimore, Md. (William L. Marbury, and Piper & Marbury, Baltimore, Md., on brief), for McCormick & Co.
 Before HAYNSWORTH, Chief Judge. FIELD, Circuit Judge, and BLATT, District Judge.
 FIELD, Circuit Judge:
 
 
 1
 This appeal involves a dispute stemming from the sale of the assets of Childers Foods, Inc., to McCormick & Company, Inc., the focal point of the disagreement being an emulsion machine and the patent application which was pending thereon at the time of the sale. In its original complaint McCormick alleged that it had been induced to enter into the contract by false representations made by Childers, and sought rescission of the contract of sale, recovery of certain shares of stock which had been issued to Childers, as well as damages.
 
 
 2
 Motions to dismiss the complaint and to quash service of process were denied by the district court.[1] Thereafter, the defendants answered and Childers also filed a counterclaim for the balance of the consideration due him under the contract. The defendants demanded a trial by jury under the rationale of Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and requested that such jury trial precede a trial in equity. McCormick filed an amended complaint and an answer to the counterclaim in which it modified certain factual allegations and elected the remedy of rescission, thereby abandoning the claim for damages which had been included in the original complaint.
 
 
 3
 The trial court awarded Childers a jury trial to determine whether he had a right to recover on his breach of contract claim which would, of course, include consideration of any defense McCormick might have thereto. Under the trial court's procedural pattern, if the jury found facts which would provide McCormick with a basis for vitiating the sale, the court would then conduct an equity trial to determine whether McCormick was entitled to rescission or whether it was barred from any such relief under established principles of equity. Broadly, the jury would pass upon events affecting the validity of the contract of sale and, if necessary, the trial court would thereafter consider McCormick's conduct subsequent to the contractual closing date of the sale.
 
 
 4
 In both the jury trial and the trial on the equity issues the principal dispute concerned the alleged misrepresentations which McCormick claimed that Childers had made with respect to the origin and method of operation of the emulsion machine. Upon special interrogatories the jury found that Childers had made misrepresentations to McCormick; that McCormick relied upon one or more of the misrepresentations when it entered into the contract and would not have entered into the contract if such misrepresentations had not been made. The jury further found that the misrepresentations made by Childers were not of a fraudulent nature and that Childers had not been guilty of the deliberate concealment of any material fact. The jury also determined that McCormick had not been negligent in failing to discover the falsity of the misrepresentations prior to either the signing of the contract or the date of closing.
 
 
 5
 Following the jury trial both sides filed motions for judgment n. o. v. and, additionally, the defendants filed motions for a new trial. The court deferred action on all of these motions and proceeded with the trial of the equitable issues. At the conclusion of the equity trial, the court filed its opinion in which it denied all of the post-jury motions and made certain factual findings based upon the evidence presented at both the jury trial and the trial to the court. Upon the factual findings derived from all of the evidence the district judge held that Childers had made an innocent misrepresentation with respect to an essential feature of the agreement which would entitle McCormick to rescission unless precluded by other equitable principles. While the court further found that the conduct of McCormick did not constitute an affirmance of the transaction, it did conclude that McCormick was guilty of an unreasonable delay in seeking rescission and that the resultant change of circumstances made it inequitable to require Childers to make full restitution. Upon this basis the court ordered that the purchase price should be reduced by denying Childers the right to recover from McCormick the balance of the consideration due under the agreement, and also requiring him to return to McCormick the stock which he had theretofore received as part of the purchase price. Both McCormick and Childers have appealed from this action of the district court.
 
 
 6
 A consideration of the issues presented on these appeals requires a somewhat lengthy review of the facts with respect to the background and development of the subject machine, as well as the conduct of the parties incident to their negotiations and execution of the contract of sale.
 
 
 7
 Earl Childers has only a 9th grade education, but obviously is a man of considerable mechanical ingenuity and resourcefulness. Prior to 1968 he had engaged in several enterprises, including Childers Foods, Inc., located at Bedford, Virginia, which sold deboned chicken parts to salad makers and other customers. In the late 1950s Childers developed a "belt machine" which was designed to facilitate the separation of the meat from the bone. In 1960 he obtained a patent on this machine designated as U. S. Patent No. 2,932,058. In the early 1960s Childers developed a second machine known as the "shaker machine," U. S. Patent No. 3,118,172, which further refined the processing of deboned chicken parts.
 
 
 8
 In the middle 1960s Childers began to sell emulsified chicken processed from chicken necks to the Gerber Company for use in baby food, and incident to the development of an improved product investigated a vegetable pulper produced and marketed by FMC Corporation. In March of 1966 Childers ordered a Model 50 Pulper from FMC although a representative of that company had advised him that the pulper was designed to produce emulsion from fruit or vegetables and would not debone chicken parts. The FMC Model 50 Pulper, based upon two patents issued to Harold Lewis and assigned to FMC, is a basic mill-type machine consisting of a hopper, a cylindrical drum enclosing the pulper chamber, a conical distributor plate in the forward end of the chamber, a beater blade assembly inside the chamber, a perforated screen comprising the bottom half of the drum casing, and a discharge gate at the rearward end of the chamber. The beater blade assembly and the distributor plate are mounted on a rotating shaft that runs through the center of the mill. The beater blade assembly consists of two spiders attached to the ends of the rotating shaft, the spiders having four arms positioned at intervals of ninety degrees around the shaft, an arm on each spider supporting one of the four beater blades. The concave surface of the conical distributor plate faces the hopper and the convex surface faces the pulping chamber. Molded onto the convex surface of the plate are four vanes, each vane extending from the center of the plate at a ninety degree angle from the next. In the pulper the beater blades and vanes are arranged so that they alternate with one another at forty-five degree spacings as they overlap the outer edge of the distributor plate.
 
 
 9
 In undertaking to convert the Model 50 Pulper into a deboning machine Childers was aware of the fact that he must avoid breaking the bones and also control the length of time that the poultry necks remained in the machine. This time element was important to prevent the crushing of the bones and also in obtaining a maximum yield from the process.
 
 
 10
 After considerable experimentation Childers altered the Model 50 Pulper in several respects, including the following: (1) He reversed the distributor plate with its convex surface facing the hopper and its concave surface facing the chamber; (2) he installed a more powerful motor; and (3) he adjusted the relationship of the beater blade assembly to the distributor plate so that along the outer edge of the convex distributor plate the ends of each beater blade were about "two fingers" ahead of the tips of each vane in the clockwise direction of rotation. This relationship of the blades and vanes was used for processing chicken necks and the space was extended to "three fingers" in processing turkey necks.
 
 
 11
 In January of 1967 Childers retained an attorney for the purpose of obtaining a patent on the machine, and a representative of the attorney came to Bedford where he examined the machine and made several rough sketches of it. Childers did not disclose to either the attorney or his representative that the machine was an FMC pulper on which he had made certain changes. The application was filed by the attorney stating that Childers sought a patent for "Poultry Deboning and Comminuting Apparatus and Method." The background of the invention referred to several prior machines for deboning poultry, but made no reference to the fact that Childers had adapted an existing machine to what he believed to be a new use.
 
 
 12
 In the application the "Description," referring to the drawings,[2] stated in effect that the terminal end of each beater blade is curved in the direction of rotation of the beater assembly and is spaced slightly from the distal end of the adjacent vane on the distributor plate. In describing the operation of the invention the language of the application reads in part as follows:
 
 
 13
 "Thus, the portions enter the mill through the spaces provided between ends 68 and the terminal portions of elements 54. The spacing is slightly larger than the small dimension of the individual bones of the poultry portions being processed so that meat and skin may be shorn off without bone breakage. It is to be noted that elements 54 and terminal ends 68 of vanes 62 are immovable with respect to each other to prevent tearing of the meat and skin from the bones by relatively moving elements, and thus to minimize the possibility of bone breakage. However, full separation of meat and skin from the bone particles is accomplished, through the high rotational speed of axle 20. Rotation is on the order of 1800 r. p. m. or higher, in comparison with prior art devices rotating at from 200 to 500 r. p. m. thus requiring countermoving elements to tear meat from bones."
 
 
 14
 The patent drawing in the application shows the overlapping tips of the beater blades a short distance ahead of the feeder plate vanes in the direction of rotation. The application includes nine apparatus claims and one method claim.
 
 
 15
 Shortly after filing the patent application, Childers requested a machine shop in Salem, Virginia, to fabricate a machine similar to the emulsifier that he had adapted from the FMC pulper. This was delivered in the fall of 1967, and while it was strikingly different in external appearance from the converted FMC pulper, its internal parts were quite similar.
 
 
 16
 Childers Foods enjoyed a consistent increase in both sales and profits, the before tax profits in the fiscal year 1967 being twenty-seven per cent of its gross sales. In the fall of 1967, at least two large corporations expressed interest in acquiring Childers' business, but Childers declined their overtures. McCormick first learned of Childers Foods about February 1, 1968, through a firm of investment bankers who advised McCormick that Childers Foods was extremely profitable and had a unique processing machine, and that other companies were interested in acquiring the business.
 
 
 17
 Ernest Issel, Vice President and Treasurer of McCormick, was assigned the initial responsibility of investigating the possibility of the acquisition of Childers Foods, and on February 12, 1968, visited the plant in Bedford and met with Childers and his accountant. On that occasion he signed a form which stated that since Childers was divulging the financial condition of Childers Foods, Inc., and the details of a secret process invented by him to mechanically debone poultry upon which a patent was then pending, he would keep such information confidential. Issel was quite enthusiastic about the Childers operation and on February 15, 1968, several representatives of McCormick visited the plant in Bedford and discussed the various aspects of the business with which each was particularly conversant. These representatives signed a nondisclosure agreement identical to that which had been signed by Issel. On that occasion Childers stated that he would not let them see how the emulsion machine worked until an agreement was reached.
 
 
 18
 On February 16, 1968, Issel requested Willard Hayes, McCormick's patent counsel, to investigate the Childers patents and patent application and advised him that Childers had authorized him to discuss the matter with Keith Misegades, Childers' patent attorney. On the following day McCormick's Board directed the officers to make an offer to purchase the assets of Childers Foods for 2.8 million dollars, subject, inter alia, to a favorable opinion from McCormick's patent counsel. On February 19, Issel and other representatives of McCormick went to Bedford and tendered to Childers a letter of intent setting forth McCormick's offer to purchase. The letter of intent stated that the purchase would be subject to a favorable opinion from patent counsel as to the validity and enforceability of the patents as well as the patentability of the pending application No. 635,607. Childers agreed to the terms of the letter of intent with certain minor modifications and an increase in the purchase price to three million dollars. Upon approval of the modifications by the directors, Issel executed the letter on behalf of McCormick and mailed it to Childers on February 21st.
 
 
 19
 Hillsman V. Wilson, McCormick's general counsel, who was charged with the responsibility of the legal aspects of the acquisition, requested Childers to instruct Misegades to allow Hayes to inspect the patent application and to supply any additional information needed by McCormick. Pursuant to Childers' authorization, Misegades delivered a copy of the application to Hayes and permitted him to make a xerox copy of it. Wilson received a copy of the patent application shortly after February 23 and made it available to other personnel of McCormick. No one in the McCormick organization suggested that anyone go to Bedford to see how the emulsion machine operated, although Childers did not object to an examination of the machine and its operation by any of the McCormick people who went to Bedford after February 21st. During this period McCormick conducted a review of the various books and records of Childers Foods, which records reflected the purchase of two pulpers, together with replacement parts, from FMC.
 
 
 20
 Meanwhile, Hayes had initiated his study of the patent application. He read the application as describing a machine wherein the leading faces of the radial vanes protruding from the conical distributor or feed plate, rotating at about 1800 r. p. m., guided the chicken parts and by centrifugal force propelled them through the small openings created by the overlapping portions of the beater blades which lead the radial vanes, and that this movement of the chicken parts through the relatively small gap sheared the meat from the bone. Two of his associates, however, expressed doubt that all of the chicken parts could enter the chamber through the small gaps between the vanes and the beater blades, and one of the associates was uncertain that the language of the application intended to convey the impression that all of the material did, in fact, enter the chamber only through the four narrow gaps. Hayes himself found it "somewhat puzzling" but assumed "that is the way it works."
 
 
 21
 On March 12 Hayes attended a meeting of McCormick's directors and, in effect, advised them of his reading of the patent application, stating that if the narrow gap created by the spacing relationship between the vanes and the beater blades was critical, necessary and essential to the operation of the emulsion machine, he was of the opinion that McCormick could obtain a patent on it. He further advised the directors that he would be unable to complete his patent search and report prior to March 22nd.
 
 
 22
 On March 14 Childers and his counsel met with representatives of McCormick in Washington, D. C., to discuss the proposed contract of sale. The draft of the sales contract which McCormick had prepared contained a clause which made the contract subject to the condition that McCormick obtain a favorable written opinion from its patent counsel "that the invention claimed in U. S. Patent Pending S. N. 635,607 is a patentable invention." Childers insisted that this condition be eliminated from the contract, stating that he wanted a definite agreement with no options in it. Childers further advised McCormick's representatives that they could conduct whatever investigation they felt necessary to satisfy themselves on this aspect of the contract, but he made it clear that he was unwilling to guarantee patentability.
 
 
 23
 McCormick was apprehensive that further delay might jeopardize the acquisition, and on March 15 the directors authorized their negotiators to enter into a contract of sale with the patentability opinion clause deleted, provided their patent counsel gave a favorable opinion after discussing the machine further with Childers and his counsel. At the meeting that afternoon in Washington, Misegades brought certain photographs of the emulsion machine, one of which showed the machine in an open position with the feeder vanes and beater blades set in relation to each other as shown in the patent application drawing. Hayes asked Childers if the gap between the vanes and beater blades was "important," and Childers responded that he had tried various settings of the gap between the vanes and blades; that he did not know the reason for it, but the machine just did not work efficiently unless the vanes and blades were adjusted as shown in the application. After concluding his discussion with Childers, Hayes was satisfied that the gap feature was critical and informed McCormick's representatives that in the light of his discussion with Childers and his other investigation he was of the opinion that the emulsion machine was patentable and that McCormick could sign the agreement without reservation. The contract was signed on that same afternoon.
 
 
 24
 Under the contract as executed it was agreed that Childers Foods would sell its assets and property to McCormick for $400,000; Childers' wife, Ethel, would convey certain land and improvements thereon to McCormick for $89,000; and Childers personally would sell and assign to McCormick all of the subject patents and patent applications. McCormick agreed to pay to Childers two million dollars on the closing date and an additional $500,000 one year after the closing date, with interest at six per cent per annum. Among other provisions of the contract, McCormick was to employ Childers for a period of one year following the closing date at a salary of $24,000.
 
 
 25
 In the agreement, the sellers made sixteen representations and warranties covering various aspects of the corporate accounts and assets, including the following:
 
 
 26
 17. (f) "Childers Foods is the owner of U. S. Patent No. 2,932,058 dated April 12, 1960, and Mr. Childers is the owner of U. S. Patent No. 3,118,172 dated January 21, 1964, U. S. Patent Pending S. N. 635,607, United Kingdom Patent No. 983,198 and Canadian Patent No. 708-314 all free and clear of any liens, encumbrances or licenses except between Childers Foods and Mr. Childers. Sellers have no knowledge of any pending or threatened claims of infringement or interference involving such patents."The contract further provided that the closing date would be April 1, 1968, and that as of that date the sellers would deliver to McCormick a certificate containing their representations and warranties which would survive the closing.
 
 
 27
 On March 28 Hayes sent Wilson a letter in which he gave his opinion as to the validity of the two Childers patents as well as the patentability of the pending application S. N. 635,607. The letter once again set forth Hayes' understanding of the operation of the machine as detailed in the patent application and in regard to the spacing of the vanes and beater blades stated:
 
 
 28
 "Mr. Childers, during the course of our conference, emphasized the critical importance of this feature and stated that when the parts were adjusted differently from that shown and described in the application, the machine would not work at all satisfactorily. He contended that, if the gap is closed or made substantially larger than the size of the bones, the machine does not work with efficiency."
 
 
 29
 In their search, Hayes and his associates had encountered the Lewis Patent upon which the FMC Model 50 Pulper was based and the letter noted that "the general resemblance to the Childers machine is striking." Hayes continued:
 
 
 30
 "If these differences are critical, as Childers contends, we believe we can satisfy the Examiner in the Patent Office, and a court which might be called upon to review a patent granted on the application, that it would not have been obvious to one having ordinary skill in the art at the time the Childers invention was made to change the Lewis pulper in these respects, to produce the new and unexpected results accomplished by the Childers machine. If so, under Section 103 of the Patent Act of 1952 we are entitled to a patent and the patent should be held valid.
 
 
 31
 "Moreover, the Lewis patent indicates that machines of the general types shown were old in 1934. The fact that in all of these years no one prior to Childers adapted them for chicken deboning suggests that the necessary changes were not obvious. * * *"
 
 
 32
 The settlement of the purchase and closing was effected in Baltimore, Maryland, on April 1, 1968, at which time Childers and the other defendants delivered a certificate to McCormick pursuant to the sales agreement in which they restated in substance all of the sixteen representations and warranties made by them in that instrument. At the closing McCormick delivered to Childers and the other defendants checks totaling two and one-half million dollars. Subsequent to the closing, in April of 1968, McCormick and Childers entered into a supplementary agreement whereby Childers accepted 4,500 shares of McCormick stock and the parties reduced the remaining contractual indebtedness from $500,000 to $248,000.
 
 
 33
 During the period from the closing date until August of 1968, a number of McCormick employees had occasion to observe the emulsion machine in operation and it became apparent to them that the machine had been developed from an FMC Model 50 Pulper. When this information was presented to Hayes, he advised that the origin of the machine would not affect patentability if Childers had designed changes therein which produced new, improved and unexpected results. A representative of Hayes inspected the emulsion machine in Bedford on October 30, 1968, and found it to be functioning efficiently with the feeder vanes leading the beater blades which was, of course, the reverse of their relationship as shown and described in the patent application.[3] In his report he stated that the machine was being operated with "each beater blade * * * reasonably close to a leading radial vane" and that "[t]he invention described in the patent application differs from the apparatus actually being used in the positioning of the radial vane with respect to the beater blades." The conclusion was that the Bedford plant was not using the apparatus which was the subject of the patent application. Following this development, McCormick proceeded with further investigation, conducted discussions with Childers, and when settlement negotiations collapsed instituted the present action.
 
 
 34
 In analyzing the jury's answers to the interrogatories, the district judge concluded that it could have found that Childers made three misrepresentations with respect to the emulsion machine. First, he failed to disclose to McCormick that he had adapted an existing machine to a new use and gave the impression that he had designed a completely novel machine in its entirety; second, that the statement repeated several times in the patent application that the assembly rotated at 1800 r. p. m. was admittedly in error; and third, Childers statement to McCormick's attorney on March 15, 1968, relative to the relationship of the feeder cone vanes and the beater blades as shown in the patent application was incorrect. Upon the issue of rescission, the court eliminated the first two misrepresentations from consideration. Taking April 1, 1968, the closing date, as the point of reference, the district judge found that McCormick's attorney was on notice prior to that date that the emulsion machine had been developed from an existing machine constructed upon the basis of the Lewis patent; and further, that on April 1, 1968, or shortly thereafter, McCormick knew that the assembly did not rotate at 1800 r. p. m. but by reason of the "step down" from the motor, it operated at a substantially lower speed. Independently of the jury finding, however, the district judge found that the statement made by Childers to Hayes that the gap created by the setting of the feeder vanes and beater blades shown in the patent application was important and essential to the satisfactory operation of the invention was a false (though not fraudulent) representation upon which McCormick was entitled to rely when it executed the contract of April 1, 1968. It was on this finding that the trial judge concluded McCormick was entitled to seek rescission.
 
 
 35
 In reaching this conclusion on the issue of rescission the district judge relied heavily on the Restatement,[4] particularly Sec. 28 of Restatement of Restitution, which reads in part as follows:
 
 
 36
 "A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced:
 
 
 37
 "(a) by the fraud of the payee, or
 
 
 38
 "(b) by his innocent and material misrepresentation, or
 
 
 39
 * * *"
 
 
 40
 We have no quarrel with this basic principle adopted by the trial court for it now appears to be well settled that material misrepresentations, even though innocently made, may be sufficient to warrant rescission in a court of equity. Glendale Corp. v. Crawford, 207 Md. 148, 114 A.2d 33 (1955); Williston on Contracts Sec. 1500 (3rd ed.); Restatement of Contracts, Sec. 476(1).
 
 
 41
 Misrepresentation as a basis for the jurisdiction of courts of equity evolved at a time when existing common law actions were inadequate to deal with a variety of injustices in cases which would not qualify as actions for deceit. Since the equity courts did not take jurisdiction for the purpose of awarding damages they were primarily concerned with the injustice of permitting a person who had made false representations, even innocently, to retain the fruits of a bargain induced by such representations. They therefore developed a remedy for innocent misrepresentation as well as for fraud and mistake. Often, however, an equity court declined to put a new label on the action but rather preferred to expand its definition of fraud and speak of an innocent misrepresentation as a form of fraud. 3 Pomeroy's Equity Jurisprudence Sec. 888 (5th ed. 1941); McClintock, Equity, Sec. 80 (2nd ed. 1948). While there is much apparent confusion in the cases resulting from the use of the word "fraud" in several different senses, the same basic principles are applied in all three areas. Under the restrictions peculiar to courts of equity a plaintiff in such a case cannot be guilty of conduct inconsistent with the relief demanded, and it is usually denied if the complaining party has affirmed the transaction or has been guilty of unreasonable delay in seeking relief after discovery of the facts. It was, of course, through the application of these principles that the district court denied complete restitution to McCormick. Without detailing the evidence, we agree with the trial judge that the record clearly supports a finding that McCormick was guilty of unreasonable delay in seeking rescission. However, we conclude that he was in error in his finding that McCormick had made out a case for rescission at all.
 
 
 42
 In a suit for rescission, the party seeking relief must not only show that the representation was false, but also that he relied upon the representation and was justified in such reliance. This principle and its application is aptly stated in 3 Pomeroy's Equity Jurisprudence Sec. 891 (5th ed. 1941):
 
 
 43
 "The requisite that the representation must be relied upon, plainly includes the supposition that the party is justified, under all the circumstances, in thus relying upon it. This branch of the rule presents by far the greatest practical difficulties in the decision of cases, because, although the rule is well settled, and is most clearly just, its application must depend upon the facts of each particular case, and upon evidence which is often obscure and conflicting in determining the effect of a reliance upon representations. It is most important to ascertain, in the first place, whether the statement was such that the party was justified in relying upon it, or was such, on the other hand, that he was bound to inquire and examine into its correctness himself. In respect to this alternative, there is a broad distinction between statements of fact which really form a part of, or are essentially connected with, the substance of the transaction, and representations which are mere expressions of opinion, hope, or expectations, or are mere general commendations."
 
 
 44
 In our opinion, it is on this point that McCormick failed to make a case.
 
 
 45
 First of all, we have serious doubts that Childers' statement to Hayes at the meeting on March 15 can be characterized as a misrepresentation. When Childers told Hayes that the gap between the feeder vanes and beater blades was "important" it was, in fact, truthful for at that time Childers was unaware that the machine would work just as efficiently when the gap was created by the reverse relationship of the vanes and blades.[5] It is clear, however, that in asking the question Hayes was not primarily interested in the gap itself but in confirming his reading of the patent application to the effect that all of the chicken parts passed between the leading faces of the vanes and the trailing faces of the beater blades, shearing the meat from the bones in the process. The district judge made a specific finding that in this respect Hayes was reading his own ideas into what Childers said, and it should be noted that at no time did Hayes refine his question to Childers and ask him specifically whether all of the meat passed through the gap.
 
 
 46
 It would further appear that in the context of Hayes' question, Childers statement was merely an opinion. In concluding that the expression was a statement of fact, the district judge cited McNabb v. Thomas, 88 U.S.App.D.C. 379, 190 F.2d 608 (1951), which stated that under appropriate circumstances an opinion may become a statement of fact especially when uttered by one with superior knowledge. However, McNabb clearly recognized that such a determination depends to a large degree upon the equality of position of the parties, noting that an opinion made by a chemist to a layman about the properties of a composition should be treated quite differently from the same opinion made by a chemist to another chemist.
 
 
 47
 In Reeves v. Corning, 51 F. 774 (Cir. Ct. D.Ind.1892), a patent case in which rescission was sought on the basis of false representations, the court stated:
 
 
 48
 "There is no certain rule of law by the application of which it can be determined when false representations constitute matter of opinion or matter of fact. Each case must, in large measure, be adjudged upon its own circumstances. In reaching its conclusion the court will take into consideration the intelligence and situation of the parties, the general information and experience of the people as to the nature and use of the property, the habits and methods of those dealing in or with it, and then determine, upon all of the circumstances of the case, whether the representations ought to have been understood as affirmations of fact, or as matters of opinion or judgment."
 
 
 49
 Viewed in this light, we conclude not only that Childers was merely stating his empirical opinion but also that Hayes should have considered it to be exactly that. In making his statement, Childers prefaced his remark with the puzzled observation that "he did not know why it was" but the machine did not work efficiently unless adjusted to the setting shown in the application. Hayes himself referred to Childers' statement in his letter to McCormick dated March 28 as a "contention." This would appear to reflect doubt on the part of both parties and negates a finding that it was an assurance of fact by Childers that the machine operated in the manner in which Hayes read the patent.
 
 
 50
 Additionally, any representations regarding the validity of a patent are generally considered matters of opinion. Dillman v. Nadlehoffer, 119 Ill. 567, 7 N.E. 88; Johnson v. Brewer-Titchener Corp., 28 F.Supp. 1002 (N.D.N.Y.1939). In this highly technical field a layman lacks the expertise to make a legal determination, a decision which can only be rendered ultimately by the courts. McCormick would have us accept its contention that the statement related only to the operation of the machine and in no way pertained to patentability. We cannot, however, close our eyes to the purpose of the questioning. Hayes sought information on the functioning of the machine to evaluate patentability, and he viewed patentability as dependent upon the gap feature and the supposed process of shearing as the meat passed through the small apertures. While Hayes questioned Childers on the importance of this feature, in essence, he was asking "was the machine patentable?", and with an affirmative answer, Hayes assumed the machine had the requisite novelty. We cannot accept the proposition that a response to a direct question on patentability represents an opinion, while a comment on the importance of a feature on which the inquiring party assumes patentability to be contingent must be cast in the posture of a statement of fact.
 
 
 51
 Finally, in our opinion McCormick's investigation of the patentability of the emulsion machine precludes it from asserting reliance upon Childers' representation. Childers had adamantly refused to condition the agreement upon an opinion of patentability and advised McCormick to take the time necessary to investigate it prior to execution of the contract. McCormick initiated the investigation and assuredly had the necessary experience and expertise to analyze the patent application and examine the machine and its operation. There was ample opportunity to explore every facet of patentability for the district court found that after February 21 Childers was willing to permit any representative of McCormick to examine the machine in operation at Bedford. Under these circumstances, a long line of authority denies to McCormick the right to rely upon Childers' statement. Slaughter's Admr. v. Gerson, 80 U.S. 379, 20 L.Ed. 627 (1871); McNabb v. Thomas, 88 U. S.App.D.C. 379, 190 F.2d 608 (1951); Horton v. Reynolds, 65 F.2d 430 (8 Cir. 1933); Attwood v. Small, (House of Lords, 1838), 6 Clarke & Finnelly 232, 7 English Reprints 684; 3 Pomeroy's Equity Jurisprudence Sec. 893 (5th ed. 1941). Nor is McCormick's position ameliorated by its decision to curtail its investigation and sign the agreement upon the basis of Childers' answers to Hayes' questions. Hayes candidly testified that there were two phases to a patent investigation; first, whether the application itself describes a patentable machine or method and, second, whether the application accurately describes the machine in operation. Apprehensive that further delay might jeopardize the agreement, McCormick saw fit to forego the second phase of the investigation. However, this decision by McCormick cannot relieve it from responsibility nor shift the burden to Childers. Having entered upon the investigation, and having unimpeded access to all of the facts, McCormick was charged with knowledge of everything that a proper investigation would disclose. The principle is clearly and succinctly stated in Pomeroy's Equity Jurisprudence, supra, Sec. 893. "The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness."
 
 
 52
 Concluding as we do that McCormick was not entitled to rescission, the judgment of the district court will be reversed and the case remanded for the entry of judgment in favor of Childers on McCormick's amended complaint. Upon the remand the district court shall also ascertain the damages on Childers' counterclaim and enter judgment in his favor for the amount so found.
 
 
 53
 Reversed and remanded.
 
 
 
 [1]
 The trial court's opinion on these motions is reported in McCormick & Company v. Bedford Industries, Incorporated, 301 F.Supp. 29 (D.Md.1969). Subsequent to the sale, Childers Foods, Inc., changed its name to Bedford Industries, Incorporated, and the latter was named as the corporate defendant in this action. However, it was referred to as Childers Foods in the opinions filed by the district judge, and in the interest of clarity the corporate defendant will be similarly referred to in this opinion. The action was dismissed upon jurisdictional grounds as to two of the individual defendants, Eliza Childers and Marion Young
 
 
 [2]
 On the drawings, the radial vanes on the feed or distributor plate were designated as number 54. The beater blades were designated as number 62 and the terminal ends thereof as number 68
 
 
 [3]
 The district court made the finding that, in fact, the emulsion machine worked just as efficiently with the feeder plate vanes leading the beater blades by 1 1/8 or 1 1/4 inches as with the feeder plate vanes trailing the beater blades by 1 1/8 or 1 1/4 inches
 
 
 [4]
 The district court noted that under Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the conflicts law of Maryland would be applied in this case and that Maryland would apply the law of the District of Columbia, the place where the contract was made. The court recognized that absent any controlling authority in the District of Columbia, Maryland would assume that the courts of the District of Columbia would follow Maryland law. However, the court further found that there was no substantial difference between the law of Maryland and the District of Columbia, and this appears to have been conceded by all parties to this litigation
 
 
 [5]
 As previously noted the district judge made the finding that the machine operated at the same efficiency with the beater blades trailing or leading the feeder vanes. See no. 3, supra. It should be understood, however, that if the term "gap" referred to the special relationship of the two parts rather than the sequential relationship, Childers' statement of its importance was true. A smaller gap would increase bone breakage as a result of the larger meat parts attempting to pass through the openings. The 1 1/8 (chicken parts) or 1 1/4 (turkey parts) aperture described in the application provided a slightly larger opening than the dimensions of the pieces, which allowed a relatively free flow into the machine and minimal contact with the working parts of the emulsifier. An increase in the gap disrupted the feed rate, and because steady feed affected the time that parts remained in the chamber which was critical to efficiency, this naturally decreased optimum performance of the machine