**GENERAL RESEARCH CORPORATION,**
Plaintiff,

v.

**UNITED STATES, et al., Defendants.**

Civ. A. No. 81–0979–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

June 7, 1982.

As Amended June 8, 1982.

Brian P. Gettings, Arlington, Va., for plaintiff.

Thomas K. Berger, First Asst. U. S. Atty., Alexandria, Va., for U. S.

C. Torrence Armstrong, Alexandria, Va., for intervenor defendant System Automation Corp.

MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This case concerns a military procurement known by the acronym "PERDDIMS," for Personnel Development and Distribution System.[1] The Army's Military Personnel Center ("MILPERCEN") intends to use PERDDIMS, which will be a centralized database computer system, to distribute and assign military personnel to its bases.

Defense Supply Service-Washington ("DSS–W") has handled the procurement for MILPERCEN. It has let two contracts for the procurement, "PERDDIMS I" and "PERDDIMS II." Only the award of the second contract is at issue in this case, but the preceding contract is background to the dispute over PERDDIMS II.

DSS–W awarded PERDIMMS I to the plaintiff here, General Research Corporation ("GRC"), on September 29, 1980. On October 16, 1980, the intervenor-defendant here, System Automation Corporation ("SAC"), which bid on but failed to get PERDDIMS I, filed a bid protest. SAC charged that certain GRC employees working in connection with the PERDDIMS project formerly had been MILPERCEN employees with responsibilities relating to PERDDIMS, and that their conduct constituted violations of the federal conflict-of-interest laws. The Army's Criminal Investigative Division ("CID") began an inquiry into the matter, and later a grand jury in the Eastern District of Virginia was convened to examine the allegations. SAC also filed an action in the United States District Court for the District of Columbia, seeking to enjoin GRC from further performance on PERDDIMS I and to get a declaratory judgment that the contract was void. SAC moved for and received voluntary dismissal of this suit on January 29, 1981, because two days earlier the contracting officer at DSS–W responsible for PERDDIMS I, Mr. Bachhuber, terminated PERDDIMS I. He

1. This court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331(a) in that the action arises under the Constitution and laws of the United States.

did so under the contract's "termination-for-'convenience'" clause, which permits termination "whenever for any reason the Contracting Officer shall determine that such termination is in the best interest of the Government."

Initially, however, Bachhuber doubted that he should terminate the contract. He requested a legal opinion regarding his alternatives from DSS–W counsel, but remained uncertain after receiving it. He then sent a letter to Mr. Joseph J. Aronica, Assistant United States Attorney for the Eastern District of Virginia, in which he stated that he understood Aronica was supervising an FBI investigation into the allegations against GRC, and he requested "releasable" information resulting from that investigation. Aronica informed Bachhuber by letter that "[t]he allegations and the evidence thus far uncovered are serious and warrant further investigation by a federal grand jury which may result in a criminal indictment in the future." Aronica also pointed out that he was "unable to release any detailed evidence."

Bachhuber was still uncertain after receiving Aronica's letter. He then requested a meeting with Aronica, which took place at the office of the United States Attorney in Alexandria, Virginia. After this meeting Bachhuber drafted a memorandum stating:

> I have received verbal information from Mr. Aronica and his colleague Mr. Fisher [another assistant United States Attorney in the Eastern District of Virginia] that the U.S. Attorney has documentary and testimonial evidence that Messrs. Schinderman and Walker [GRC employees] assisted GRC in the preparation of its PERDDIMS proposal while still employees of MILPERCEN, clearly fraudulent and illegal acts.

Bachhuber then terminated PERDDIMS I.

At the Pentagon, discussions among higher-level officials ensued concerning the government's next move in relation to the PERDDIMS procurement. In April of 1981, certain officials discussed whether an agency other than DSS–W should handle a second PERDDIMS contract award, or, indeed, whether there should even be a PERDDIMS procurement at all. The officials were clearly concerned about adverse publicity, particularly if GRC turned out to be the superior bidder the second time around. The notion that GRC's "tainted" conduct in relation to the first contract also would taint its eligibility for the second contract was another subject of discussion.

The officials decided to go forward with the procurement. They also decided to have DSS–W handle it, with the proviso that it use a "clean slate," i.e., DSS–W employees unconnected with PERDDIMS I. DSS–W appointed a Mr. Reppert to serve as contracting officer for PERDDIMS II. MILPERCEN, which supplied technical evaluations of proposals to DSS–W, also was to use a "clean slate," but inexplicably did not do so.

On June 18, 1981, DSS–W issued a request for proposals for PERDDIMS II. The contract contemplated by the request for proposals contained substantially the same technical and functional requirements as PERDDIMS I. GRC then informed Reppert, by letter, that it wished to use Schinderman and Walker for PERDDIMS II, and it requested that DSS–W go on record as not "condon[ing] prejudice against GRC . . . as a result of allegations made in connection with the previous protest." A DSS–W attorney, Major Cathey, advised Reppert's superior, Miller, not to respond to the letter, and no letter was sent. Reppert did tell GRC that DSS–W would treat it fairly, and did not object to the proposed use of Schinderman and Walker. Curiously, around the same time DSS–W advised a third bidder, Computer Sciences Corporation, that its proposed PERDDIMS project manager, Lt. Colonel William Green, might have a conflict-of-interest problem, because he formerly had been project manager of PERDDIMS at MILPERCEN. Computer Sciences Corporation did not solicit this advice; DSS–W volunteered it. Moreover, upon request, Computer Sciences Corporation received a formal written opinion on the propriety of using Lt. Colonel Green for PERDDIMS from the Judge Advocate General.

GRC believes that the Army decided in advance not to award GRC PERDDIMS II due to possible adverse publicity; however, because the Army needed as many bidders as possible in order to encourage competition, it tricked GRC into bidding. By GRC's lights, the Army also tricked GRC into presenting its proposal in such a way that the Army would have an excuse to deny GRC the contract. Because DSS–W made no objection to GRC's stated intent to use Schinderman in connection with PERD-DIMS II, GRC had Schinderman represent it at technical negotiations. DSS–W later was to use this conduct as a reason for denying GRC the PERDDIMS II contract.

Until September 25, 1981, Reppert intended to award PERDDIMS II to GRC, because it submitted the lowest bid and its proposal was technically superior to the other proposals. However, on that day CID briefed him regarding its investigation, and he examined CID reports that rather mysteriously appeared on his desk. The CID reports stated that there was evidence of conflicts of interest and fraud in connection with GRC's effort to obtain the PERD-DIMS I contract, including evidence that (a) the two former MILPERCEN employees passed information to GRC regarding PERDDIMS while they were still in the government's employ; (b) GRC could not have successfully bid on PERDDIMS I without this inside information; and (c) GRC offered one MILPERCEN employee a bonus of $200 per month for an indefinite period if GRC were successful in obtaining the PERDDIMS contract.

Reppert then decided that he should determine whether GRC was "nonresponsible." Under Defense Acquisition Regulation ("DAR") § 1–902 (32 C.F.R. 1–902),

> Purchases shall be made from and contracts shall be awarded to, responsible prospective contractors only.... A prospective contractor must demonstrate affirmatively his responsibility, including, when necessary, that of his proposed subcontractors. The contracting officer shall make a determination of nonresponsibility if ... the information ... obtained does not indicate clearly that the prospective contractor is responsible.

A contractor cannot be responsible within the meaning of the DAR unless it has "a satisfactory record of integrity." DAR § 1–903.1(iv) (32 C.F.R. 1–903.1(iv))

Major Cathey earlier had discussed the "taint" theory with higher officials. (He was also the person who advised Miller not to write GRC any letter addressing GRC's concerns stemming from PERDDIMS I.) In his memorandum to Reppert, Cathey advanced the "taint" theory:

> The taint theory is sufficient for a nonresponsibility determination if the contracting officer believes that the Termination for Convenience of the PERD-DIMS I contract was proper. The circumstances and evidence which led to that decision by the contracting officer, Mr. Bachhuber, remain unchanged and are set out in numerous documents and memos contained in the files of this office, as well as that of Mr. Bachhuber.... Furthermore, the contracting officer must also determine that PERD-DIMS I and PERDDIMS II are essentially the same project for the taint of one to pass to the other.... If the contracting officer accepts the taint theory, and independently determines that there is a taint, and if he accepts the fact that the two PERDDIMS projects are essentially the same, then the only remaining element is met when Mr. Shinderman actively negotiated for GRC on 25 August 1981—a fact within the personal knowledge of the contracting officer.

On September 29, 1981, Reppert signed a written determination of "nonresponsibility." Pursuant to DAR 1–904.1, he set forth the basis of the determination:

> a. The taint of PERDDIMS I passes on to PERDDIMS II.
>
> b. A new, independent conflict of interest problem in PERDDIMS II, which is sufficient enough to add to this determination.

The "new problem" was Schinderman's participation in PERDDIMS II negotiations.

Reppert then awarded PERDDIMS II to SAC, which has completed a substantial portion of PERDDIMS. GRC then brought this action against the United States on October 5, 1981, and SAC intervened as a defendant. Seeking injunctive and declaratory relief similar to what SAC earlier sought vis-a-vis PERDDIMS I, GRC alleged that it had suffered a deprivation of a liberty interest without due process, and that the government had violated section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...."

■ On October 22, 1981, this court denied GRC a preliminary injunction under Fed.R.Civ.P. 65. At that time it reviewed Reppert's determination of nonresponsibility and examined the CID documents on which he relied. The court found that Reppert had a rational basis for his determination. GRC then amended its complaint to claim that the nonresponsibility determination was made in bad faith, because it relied in part on grand jury information leaked in bad faith by Aronica, and Aronica's bad faith was attributable to DSS–W, which used that information. Bad faith action in a contract award process is arbitrary and capricious. *See Keco Industries v. United States*, 492 F.2d 1200, 1203–4 (Ct.Cl.1974); *Tidewater Management Services, Inc. v. United States*, 573 F.2d 65 (Ct.Cl.1978); *Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt*, 516 F.Supp. 1085 (D.R.I.1981). Under its supervisory powers, this court held a closed hearing to determine whether a violation of Fed.R.Crim.P. 6(e)(2) had occurred. The court determined that there were no disclosures of "matters occurring before the grand jury." Later, this court, per Judge Bryan, granted summary judgment to defendants on the count of the amended complaint relating to deprivation of a liberty interest.

Thus, by the time of the full hearing on the merits, the avenue of attack left open to GRC was a truncated claim under 5 U.S.C. § 706. At the hearing the court received extensive evidence on this claim, including evidence going beyond the written record constituted by Reppert's nonresponsibility determination.

■ Ordinarily, a court's mandate to review under 5 U.S.C. § 706 goes no further than the written record before it. In particular, courts ordinarily cannot inquire into the mental processes of the administrative decision-maker. This "mental processes rule" was the bitter fruit of the Morgan cases. *See United States v. Morgan*, 313 U.S. 409, 421–22, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941) (*"Morgan IV."*) However, this general prohibition falls by the wayside once the aggrieved party makes a strong showing of official misconduct. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *on remand*, 335 F.Supp. 873 (W.D.Tenn.1972). *See also Singer Sewing Machine Co. v. N. L. R. B.*, 329 F.2d 200 (4th Cir. 1964).

■ The government is entitled to a presumption of good faith in its dealings with contractors. *Boyle v. United States*, 515 F.2d 1397 (Ct.Cl.1975). *See also Pacific Architects and Engineers, Inc. v. United States*, 491 F.2d 734, 744 (Ct.Cl.1974). Also, contracting officers enjoy wide discretion in making responsibility determinations. *Venice Maid Co. v. United States*, 639 F.2d 690, 698 (Ct.Cl.1980). Nonetheless, there were irregularities in the procurement process sufficient to justify the court's receipt of evidence going beyond the written record and bearing on GRC's claim of action in bad faith by the government.

GRC's bad faith claims varied.[2] First, at the hearing on the preliminary injunction

---

2. The government has had its own bad faith theory as to GRC throughout. It has steadfastly maintained that GRC brought this suit solely to get the jump on criminal discovery. GRC

denies this, and counters with a pot-calling-the-kettle-black charge that GRC would not have lost its PERDDIMS I contract but for the

the bad faith issue was Reppert's citation of Schinderman's participation in technical negotiations for PERDDIMS II, after Reppert failed to object to GRC's openly stated plan to use him. Next, GRC pursued its theory that there had been grand jury disclosures, and that the alleged bad faith of the assistant United States attorneys was attributable to DSS–W.[3] Finally, by the date of trial, GRC had a more global theory, adumbrated *supra*, to the effect that higher-ups at the Pentagon decided in advance to deny PERDDIMS II to GRC, and manipulated Reppert into doing the dirty work for them. At trial GRC introduced evidence relating to this theory. A former SAC employee also testified that SAC obtained a draft functional description of PERDDIMS II, an inch-thick document which SAC should not have had.

■ After hearing the evidence at trial, the court finds that the government did not act in bad faith. The DAR places the responsibility for making "nonresponsibility" determinations on the contracting officer. *See* DAR § 1–902 (32 C.F.R. § 1–902). *Cf. Pacific Architects and Engineers, Inc. v. United States*, 491 C.F.R. 734, 744 (Ct.Cl.1974) (clause requiring contracting officer to negotiate equitable adjustment with contractor puts determination in officer's discretion); *Schlesinger v. United States*, 390 F.2d 702, 709 (Ct.Cl.1968) (default-termination clause gave power to terminate to "the Government" and did not single out contracting officer). Whatever the intent of other officials in the Department of the Army was, the contracting officer, Reppert, made an independent and rational determination of "nonresponsibility." He did not abdicate his responsibility to make an independent determination.

■ On the basis of the information obtained from CID and from assistant United States attorneys in the Eastern District of Virginia, it would be rational for a contracting officer to find that GRC failed, as the regulations require, to demonstrate affirmatively that it had a satisfactory record of integrity. Reppert summarized this information in his written determination. In addition, he adopted Cathey's "taint" theory, and abandoning his silence on the question of Schinderman's participation in technical negotiations, set up that participation as an independent reason for determining GRC nonresponsible.[4] While the court does not necessarily endorse all aspects of the determination, 5 U.S.C. § 706 does not empower a reviewing court to substitute its judgment for an agency's. The court must affirm the agency decision if it has a rational basis and was not made in bad faith. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 960 (D.C.Cir. 1980); *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203 (Ct.Cl.1974); *Blackhawk Heating & Plumbing Co. v. Driver*, 433 F.2d 1137 (D.C.Cir.1970); *Venice Maid, supra*. Reppert's stated bases for his determination are rational, and GRC did not prove that he was manipulated, pressured, or ordered to rubber-stamp an edict emanating from higher levels at the Pentagon. Also, the court does not find that other officials involved in PERDDIMS acted in bad faith as regards the nonresponsibility determination. Inept conduct is not action in bad faith.

The denouement of the GRC story is that after trial of this civil matter, GRC pled guilty to two criminal counts in the indict-

government's egregiously collapsing civil/criminal distinctions when it suited the government.

3. GRC also charged that there had been violations of the Posse Comitatus Act, 18 U.S.C. § 1385. The court, per Judge Bryan, disposed of this issue in the case at the hearing on defendants' motion for summary judgment. The Act, which prohibits use of the military as a posse comitatus "to execute the laws," does not provide for any civil remedies. Also, the court heard no evidence of actions taken in bad

faith vis-a-vis GRC by CID agents. Hence, even assuming the interpolation of Posse Comitatus Act standards into 5 U.S.C. § 706, the court heard no evidence of conduct of CID agents offensive to § 706.

4. Cathey advised Reppert that either ground was sufficient to find GRC nonresponsible, but that the "new conflict" theory would be easier to adopt if Reppert also accepted the "taint" theory.

ment returned against it by the grand jury, and to a criminal information (Criminal No. 82–0054–A). The court judicially notes this plea under Fed.R.Ev. 201. Thus, even had GRC carried its burden of proof, the court would have denied it equitable relief as to PERDDIMS, because "he who comes into equity must come with clean hands." *See Precision Instr. Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Gaudiosi v. Mellon*, 269 F.2d 873, 881–82 (3d Cir. 1959); *Hoffstot v. Dickinson, et al.*, 166 F.2d 36, 39 (4th Cir. 1948); *Ford v. Buffalo Eagle Colliery Co.*, 122 F.2d 555, 563 (4th Cir. 1941); *Bolling v. Bowen*, 118 F.2d 59, 62 (4th Cir. 1941); *Major v. Orthopedic Equipment Co., Inc.*, 496 F.Supp. 604 (E.D.Va.1980). *See also McCormick & Co., Inc. v. Childers*, 468 F.2d 757 (4th Cir. 1972).

Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants, this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public.

*Precision Instr. Mfg. Co., supra*, 324 U.S. at 815, 65 S.Ct. at 997.

An order reflecting the findings of fact and conclusions of law within this memorandum is attached.

### ORDER

This matter came before the court on plaintiff's application for declaratory and injunctive relief. The court held a full hearing on this matter on April 20, 1982. On the basis of the findings of fact and conclusions of law set forth in the memorandum accompanying this order, the court DENIES plaintiff all declaratory and injunctive relief sought by it and DISMISSES the case.