**REFINE CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 190–84C.

United States Claims Court.

March 24, 1987.

Steven M. Cohen, New York City, for plaintiff. Kenneth J. Rose, of counsel.

E. Kathleen Shahan, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

### MOODY R. TIDWELL, III, Judge:

This case is before the court on cross-motions for summary judgment pursuant to the authority vested in this court by 41 U.S.C. § 609(a)(1) and 28 U.S.C. § 1491(a)(1). Plaintiff seeks to recover costs incurred in its unsuccessful attempt to negotiate a contract with the United States.

## FACTS

In 1982 the Small Business Administration (SBA) identified plaintiff as an 8(a) minority small business contractor pursuant to 15 U.S.C. 637(a) to construct a consolidated laundry facility at the Veterans Administration's Extended Care Center in St. Albans, New York and authorized the Veterans Administration's (VA) contracting officer to negotiate directly with plaintiff. Defendant's cost estimate for the project was $5.9 million and plaintiff's proposed price was $8.7 million. Because of the large difference between the estimated cost and the proposed price, VA requested an audit of plaintiff's offer. The auditor met with Mr. Keith Scott on numerous occasions. Mr. Scott identified himself as a professional engineer acting as plaintiff's representative. It became clear during the audit that some parts of the cost estimate were prepared by Mr. Scott for plaintiff. Thereafter, Mr. Scott attended the initial negotiating session held on January 4, 1983 and identified himself as plaintiff's "consulting engineer," who was there to answer questions about the engineering aspects of the project. Prior to the January 4 meeting, the VA project supervisor as well as the VA Director of Construction and other senior VA officials learned that Mr. Scott was Chief Engineer of the Veterans Administration Medical Center, Bronx, New York. At the second, and last, negotiating session held on January 25, 1983, plaintiff reduced its price. The record indicates that Mr. Scott did not attend the second session. Thereafter, the SBA advised the VA that the reduced price was plaintiff's best and final offer and acceptable to the SBA, and the VA project supervisor noted that "[n]egotiations with the SBA 8(a) contractor have been successfully completed." None of the parties at this point in time considered Mr. Scott's participation to be questionable. However, the VA's Inspector General had received an anonymous call about Mr. Scott's activities and an investigation was undertaken.[1]

---

1. After development of the record against Mr. Scott, the Inspector General forwarded the case to a United States Attorney who presented it to a Grand Jury. Mr. Scott was not prosecuted, neither was any administrative action ever taken

Concurrently, the project supervisor requested an opinion from the VA General Counsel about the legality of Mr. Scott's representation of plaintiff and its impact on the proposed contract award. On February 3, 1983, the General Counsel advised the Administrator of the VA that it would not be in the best interests of the VA to award the contract to plaintiff for two reasons: First, a $36,000 tax lien had just been levied against plaintiff,[2] and second, representation of the contractor by Mr. Scott clearly presented a conflict of interest. The General Counsel expanded his earlier comments in a memorandum dated March 18, 1983 wherein he advised that in similar circumstances the courts had held a contract unenforceable as a matter of public policy.[3] He continued, "no criminal conviction is necessary before enforcement of a contract tainted by a conflict of interest may be denied," and concluded:

> Our view is that the same compelling reasons of public policy enunciated by the Supreme Court, i.e., to ensure honesty in Government business dealings and to overcome the inherent difficulty in looking behind a tainted transaction, apply in this case. Where preaward discussions with the bidder are tainted by at least one breach of conflict of interest regulations or statutes, we firmly believe the Veterans Administration has a sound legal basis and an obligation to the public to refuse to approve the St. Albans construction contract with Refine Construction Co. In sum, approval of the contract would be inconsistent with a strong public policy.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether there is a genuine issue of material fact must be resolved in favor of the non-moving party. *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). In addition, the "inferences to be drawn from the ... facts ... must be viewed in the light most favorable to the party opposing the motion" for summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Ball v. United States,* 1 Cl.Ct. 180, 183 (1982). The court is of the opinion that there are no genuine issues of material fact in dispute and that the case is properly before the court for disposition on cross-motions for summary judgment.

Defendant's case is premised on the argument that government contracts are routinely disaffirmed where the award is tainted by a conflict of interest and that, *a fortiori,* the government may refuse to award a contract for the same reason. In *General Research Corp. v. United States,* 541 F.Supp. 442 (E.D.Va.1982), the government refused to award a contract to a bidder who had improperly used former government officers in a prior attempt to garner the same contract. In upholding the denial of the contract to the General Research Corporation, the court stated:

> On the basis of the information obtained from [the Army's Criminal Investigative Division] and from assistant United States attorneys in the Eastern District of Virginia, it would be rational for a contracting officer to find that GRC failed, as the regulations required, to demonstrate affirmatively that it had a satisfactory record of integrity. [The contracting officer] summarized this information in his written determination. In addition, he adopted [counsel's] "taint" theory, and abandoning his si-

---

against him. Mr. Scott retired from government service on February 28, 1983.

**2.** Nothing more of merit was said in the record about the tax lien and it is not in issue in this case.

**3.** Citing, as support, *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

lence on the question of [the former Government employee's] participation in technical negotiations, set up that participation as an independent reason for determining GRC nonresponsible. While the court does not necessarily endorse all aspects of the determination, 5 U.S.C. § 706 does not empower a reviewing court to substitute its judgment for an agency's. The court must affirm the agency decision if it has a rational basis and was not made in bad faith.

*Id.* at 447 (footnote omitted).

In determining whether the VA's decision not to contract with Refine was proper, the court must first review the applicable law, Executive Order and regulations to determine whether Mr. Scott acted improperly and, if so, whether his misbehavior negatively impacted upon the procurement process to such a degree that the negotiations were "tainted," which, in turn, would justify the VA's decision not to contract with it.

The penal code forbids an officer or employee of any federal agency, "otherwise than in the proper discharge of his official duties," from acting as an agent for anyone before any agency in connection with any proceeding, contract or other particular matter in which the government is a party or has a direct and substantial interest. 18 U.S.C. § 205 (1982).

Executive Order 11222 issued May 11, 1965 by President Lyndon Johnson prescribed standards of ethical conduct by government officers and employees. Part II of the order, "Standards of Conduct," introduced the concept of the appearance of evil; that is, an action by a government employee may not be in violation of 18 U.S.C. § 205, but still may be considered impermissible because it appears to the public to be a violation. The Executive Order states, in part, the following:

\* \* \* \* \* \*

§ 201(c) It is the intent of this section that employees avoid any .action, ... which might result in, or create the appearance of—

(1) using public office for private gain;

(2) giving preferential treatment to any organization or person;

(3) impeding government efficiency or economy;

\* \* \* \* \* \*

(6) affecting adversely the confidence of the public in the integrity of the Government.

Exec.Order No. 11,222, 30 Fed.Reg. 6469 (1965).

The VA implemented Executive Order 11222 with regulations published in early 1966. 38 C.F.R. § 0.735–1, *et seq.* Section 0.735–10, General Requirements, parrots § 201(c)(1), (2), (3) and (6) of the Executive Order but spreads no light on the details or parameters of the forbidden activity. Section 0.735–11(a) prohibits the acceptance of gifts, favors, or anything of monetary value from anyone seeking to contract with the VA. Section 0.735–12 prohibits outside employment, but § 0.735–19 provides the following:

*Relations with firms or persons seeking or doing business with the Veterans Administration.*

(a) Full-time employees are generally prohibited from performing service for a contractor or other person engaged in contract or maintenance work or other business with the Veterans Administration. Written exceptions to this provision may be made by the station, department, or staff office head concerned, if in his judgment the performance of such service will not involve a conflict of interest.

38 C.F.R. § 0.735–19 (1985).

The court will look first to see whether Mr. Scott's behavior violated the penal code, 18 U.S.C. § 205. Defendant charges that Mr. Scott acted as an agent for Refine by presenting himself at the January 4, 1983 negotiating session as plaintiff's "consulting engineer" and to the auditor as plaintiff's "representative." While it is true that no person representing the VA in the negotiations considered Mr. Scott to have a conflict of interest, both plaintiff and Mr. Scott were rightly concerned about it. So much so that Refine predicated its relationship with Mr. Scott on his obtaining

permission from the VA to assist Refine. *See* 38 C.F.R. § 0.735–19(a) (1985). The record shows that Mr. Scott informed Mr. Gabriel Prince, president of Refine, that his participation had been approved by the VA. We now know that Mr. Scott discussed the possibility of assisting Refine with his supervisor but that he never received verbal approval, much less written approval. Not only did Mr. Scott not have approval to assist Refine, but on January 4, 1983, the day of the first negotiating session, he informed his supervisor that he was going on a job interview. The inference that the court draws from these two instances of Mr. Scott's untruthfulness is that he either knew or at least thought he was acting in violation of the penal code and/or the VA conflict of interest regulations.

■ The court is of the opinion, and so finds, that Mr. Scott did act in violation of 18 U.S.C. § 205. The court did not reach this conclusion lightly. The court considered Mr. Scott's self-characterization of his role, but also looked behind it to determine what Mr. Scott actually accomplished for plaintiff. Mr. Scott did attend the first negotiating session as plaintiff's "consulting engineer" and supported his "client" by assisting Mr. Prince with answers to questions put to him by the VA negotiators about material and, hence, cost estimates that Mr. Scott had personally prepared. The record is not totally clear but it does appear that Mr. Scott did not speak for his client at that session, but rather, limited his role to that of a consultant to plaintiff. This action did not constitute a violation of § 205. However, prior thereto, Mr. Scott had been directly questioned on numerous occasions by an auditor about the materials estimates he had prepared. The record is clear that Mr. Scott personally answered the questions put to him, and defended "his" estimates. In this instance, Mr. Scott acted as an agent for plaintiff in connection with the negotiation of a contract in clear violation of 18 U.S.C. § 205. "Agent" in this context is a term of art and is broadly defined as one who is authorized to act for another, or a business representative empowered to bring about contracts. In short, an agent is a person given the au-

thority to speak or act on behalf of someone else. Black's Law Dictionary 59 (5th ed. 1979). In a related case, the United States Court of Appeals for the District of Columbia Circuit held that two legal interns (night students at Georgetown University School of Law) who worked for the government could not represent anyone in a proceeding to which the United States was a party. The court found that since the two students were agents according to the express language of the statute (18 U.S.C. § 205), an inquiry into whether their actions constituted a conflict of interest was not necessary, despite the fact that the principal intent of the act is to avoid conflicts of interest. "We thus see no basis for construing the act contrary to its express wording." *United States v. Bailey*, 498 F.2d 677, 680 (D.C.Cir.1974). In *United States v. Sweig*, 316 F.Supp. 1148 (S.D. N.Y.1970), the court found that Mr. Sweig, serving as assistant to then Speaker of the House John W. McCormack, violated 18 U.S.C. § 205 by appearing before the Securities and Exchange Commission as an agent for a company in connection with the S.E.C.'s supervision of trading in that company's stock. *Id.* at 1156–57. Mr. Sweig argued that "he was not an 'agent' in the sense of having 'power to effect the legal relations' of his alleged principal." 316 F.Supp. at 1156. The court held that it need go no further than to say "that the strict common-law notion of 'agency' does not necessarily exhaust the meaning of the prohibition." *Id.* at 1157. "On the contrary, the language of the statute and the background materials the parties have cited point to a different and wider meaning." In the case at bar, Mr. Scott prepared material and cost estimates and subsequently defended those estimates before a government auditor within the context of the negotiation of a contract between the government and his principal. In this matter, Mr. Scott acted as agent for Refine.

The fact that Mr. Scott was employed in a division of the VA other than the division responsible for negotiating the contract is of no merit because the law does not so

limit the forbidden activity. Indeed, Mr. Scott could have been employed by any other federal agency, and in the same circumstances, would have been in violation of § 205. Nor can Mr. Scott escape coverage of § 205 by arguing that he acted "in the proper discharge of his duties" in the absence of any approval therefor "by the station, department, or staff office head." 38 C.F.R. § 0.735–19(a) (1983). Mr. Scott discussed his proposed undertaking for plaintiff with a supervisor empowered to approve it, but the conversation ended with nothing more than the supervisor's promise to consider the matter. Approval was never given and notwithstanding plaintiff's arguments to the contrary, the court finds that Mr. Scott had absolutely no reason to believe that he had received constructive or tacit approval. This finding is buttressed by Mr. Scott's statement to his supervisor that he was going on a job interview, when in fact, he appeared before the VA negotiators as plaintiff's "consulting engineer."

■ The court must also determine whether Mr. Scott violated the strictures of Executive Order 11222 and the VA implementing regulations. The court readily finds that Mr. Scott did not violate § 201(a) of the Executive Order or 38 C.F.R. § 0.735–11. Those sections prohibit federal employees from accepting or soliciting gifts, gratuities, etc. from any person, corporation or group having or seeking business with his agency, who are regulated by his agency, or who may be affected by his performance or nonperformance. Defendant has alleged that Mr. Scott accepted compensation for his work for plaintiff, or expected to be compensated; however, the record is devoid of any support for that argument. Since violations of § 201(a) and § 0.735–11 are predicated upon the receipt of something of value in return for services rendered, and the court finds that Mr. Scott neither received anything of value or expected to receive anything of value for his services, it follows that Mr. Scott did not violate § 201(a) of the Executive Order or § 0.735–11 of the VA regulations.

■ Section 201(c) of the Executive Order and § 0.735–10(b) of the VA Standards of Ethical Conduct both forbid activities that might result in the appearance of a violation. Defendant alleges Mr. Scott violated subsections (1)–(3) and (6). Subsection (1) prohibits the use of public office for private gain. Since the court has already found that Mr. Scott neither received pay for his services nor expected to receive pay or any other manifest example of gain, he did not violate subsection (1). Subsection (2) prohibits the giving of preferential treatment to any organization or person. There is no denying the fact that Mr. Scott assisted plaintiff, but the court finds no violation because the assistance was not preferential. The thrust of this prohibition is to prevent a government officer or employee from assisting one organization that is in competition with others. Since the prospective contractor in this case had been preselected by the SBA, the procurement was, in fact, a sole source procurement. Plaintiff had no competition for the contract, therefore, Mr. Scott could not have given it preferential treatment as the term is used. Defendant charged that Mr. Scott violated subsection (3), which forbids the impediment of government efficiency or economy. No credible proof of violation was offered and the court cannot imagine how Mr. Scott's actions could constitute a violation.

■ We come now to a more meaningful restriction, *i.e.*, No. (6), which forbids any activity "affecting adversely the confidence of the public in the integrity of the Government." Exec.Order No. 11222 § 201(c)(6), 38 C.F.R. § 0.735–10(b)(6) (1983). That the taxpayers of this nation must believe in the integrity of their government cannot be doubted and every officer and employee who enjoys the benefit of federal employment must work diligently to maintain that confidence. Once lost, or even questioned, integrity cannot be readily reestablished. It is as important as it is fleeting, and without it the country would not long survive under our republican form of government. "There are no necessary evils in

government. It exists only in its abuses."[4] Even one person's minor transgressions, or even perceived transgressions without the boundaries of acceptable behavior can and do have an effect on the trust that the American people put into their government. Multiplied enough, those perceived transgressions may grow into major problems that can only be rectified with swift, incisive and public action to salvage or reestablish the lost integrity. The procurement regulations address this very issue:

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

48 C.F.R. § 3.101–1.

The court is convinced and so finds that Mr. Scott crossed those bounds when he chose to represent plaintiff in its otherwise honorable endeavors to negotiate a contract with the VA. Mr. Scott's actions without doubt created the appearance of a conflict of interest, thus, "[a]ffecting adversely the confidence of the public in the integrity of the Government," Exec.Order No. 11222 § 201(c)(6), 38 C.F.R. § 0.735–10(b)(6) (1983). We know of at least one person who was suspicious of Mr. Scott's actions—the person who made the anonymous telephone call alerting the Inspector General. The Inspector General believed Mr. Scott had a conflict of interest because

he referred the case to the United States Attorney for criminal action and the United States Attorney believed it, as evidenced by the fact that he presented the case to the Grand Jury.

The court need not dwell further on the VA regulations implementing Executive Order 11222 because the pertinent ones, with one exception, are verbatim with the strictures of the Executive Order. However, VA employees are generally forbidden to perform any services for anyone having "other business with the Veterans Administration" unless they secure a written exception to the general rule. 38 C.F.R. § 0–735–19(a) (1983). Station, department, or staff office heads may grant such an exception "if in his judgment the performance of such service will not involve a conflict of interest." Mr. Scott attempted to get such an exemption from the general rule, but failed.[5] Accordingly, the court finds that Mr. Scott violated the general rule against performing services for a person engaged in "other business," such as negotiating a contract with the VA. Like 18 U.S.C. § 205, violation of 38 C.F.R. § 0.735–19(a) may be found by the fact of performing services for anyone having "other business" with the VA. An actual or apparent conflict of interest need not be found even though the purpose of the regulation is to prevent conflicts of interest.

This court agrees with the United States Court of Appeals for the Federal Circuit that the VA Code of Conduct regulations were very general in their terms and provide only a guide to federal officers and employees. *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983). That does not mean that they are unenforceable within the context of this litigation. For example, for an employee of the VA to perform general engineering work for a contractor who has been selected for a VA contract, in the absence of written approval to perform those services, the

---

**4.** Uttered by President Andrew Jackson, 1767–1845, upon his veto of the Bank Bill, July 10, 1832.

**5.** The court may properly assume, in the absence of any other legitimate reason given that at least the supervisor involved had a suspicion that the services to be rendered by Mr. Scott would constitute a conflict of interest.

court can quite easily find a violation of the Standards of Ethical Conduct, specifically 38 C.F.R. § 0.735–12 and 0.735–19(a). The VA's initial acquiescence in Mr. Scott's representation of Refine cannot be used by Mr. Scott to defeat the restriction. In *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), a case involving a more heinous violation of the rule but addressing the same principle, the court stated the following:

> [Congress] recognized that an agent's superior may not appreciate the nature of the agent's conflict.... It is not surprising therefore that we have consistently held that no government agent can properly claim exemption from a conflict of interest statute simply because his superiors did not discern the conflict.

*Id.* at 561, 81 S.Ct. at 315.

Having found that Mr. Scott violated 18 U.S.C. 205, Executive Order 11222 § 201(c)(6), and 38 C.F.R. § 0.735–19(a), the court must now determine whether Mr. Scott's conduct so tainted the federal contracting process as to rationally support the VA's opinion to withhold award from Refine, thereby denying to plaintiff its sought-after bid preparation costs.

The recovery of bid preparation costs is a remedy that has been available to unsuccessful bidders for at least the past 30 years. In *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956), the Court of Claims defined the test:

> [I]t must be shown that bids were not invited in good faith, but as a pretense to conceal the purpose to let the contract to some favored bidder, or to one of a group of preferred bidders, and with the intent to willfully, capriciously, and arbitrarily disregard the obligation to let the contract to him whose bid was the most advantageous to the Government.

*Id.*, 135 Ct.Cl. at 71, 140 F.Supp. at 414; *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 778, 428 F.2d 1233, 1237 (1970).

■ Plaintiff argued that the VA had an implied contractual obligation to deal fairly and honestly with Refine during the negotiation process. The courts have imposed a broad definition of what constitutes fair and honest treatment. In *Heyer*, "the Government impliedly promised that it would give honest and fair consideration to all bids received and would not reject any one of them arbitrarily or capriciously...." *Heyer Products Co. v. United States*, 147 Ct.Cl. 256, 258, 177 F.Supp. 251, 252 (1959).

As is obvious, the case law which established the implied contract to treat all bids fairly presupposes that the procurement is publically advertised and that more than one bidder participates. *Heyer* and *Keco* are not directly applicable to this case. In both *Heyer* and *Keco*, the court established that the implied contract to treat all bids fairly was to prevent the government from establishing a meaningless charade by accepting all bids, but with a preconceived notion of awarding the contract to one favored bidder. In the case at bar, Refine had been preselected by the SBA and was the only company negotiating with the VA. The question is, does the remedy apply. This court is of the opinion that it does. By submitting its proposal to the VA, the government impliedly obligated itself to treat the proposal fairly, which would include acceptance of the proposal in the absence of any serious intrinsic or extrinsic factors that would require denial of the contract.

For plaintiff to recover its preparation and negotiating costs, it must prove that Mr. Scott's transgressions did not so taint the procurement process that defendant's refusal to contract with plaintiff was arbitrary and capricious, which is not an easy hurdle to overcome. *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970). Plaintiff must show that the contracting officer's decision not to award the contract had no rational basis, or the procurement procedure involved a prejudicial violation of applicable statutes or regulations. *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir.1973); *Big Bud Tractors, Inc. v. United States*, 2 Cl.Ct. 188, 193 (1983). In ruling, the court must recognize and defer to the "wide discretion accorded to contracting officers in their evaluation of bids

and in their application of procurement regulations." *Big Bud* at 193 (citing *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1272 (5th Cir.1978)).

Defendant points out that plaintiff identified no statutes or regulations "applicable" to a procurement that addresses the VA's decision not to award the contract to Refine.[6] Unlike *General Research Corp. v. United States*, 541 F.Supp. 442 (E.D.Va. 1982), the contracting officer did not base his decision on any failure of integrity. *See* 48 C.F.R. § 9.104–1(d). The VA's decision was made primarily on the basis of the General Counsel's advice and an internal investigation finding that Mr. Scott's participation so tainted the transaction that the VA had a "sound legal basis and an obligation to the public to refuse" to contract with Refine. The issue before the court is whether the VA's decision was rational. In *United States v. Mississippi Valley Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961)[7] the court found that contracts tainted by a conflict of interest on the part of a government agent may be disaffirmed. *Id.* at 566, 81 S.Ct. at 317. The court stated:

If the Government's sole remedy in a case such as that now before us is merely a criminal prosecution against its agent ... then the public will be forced to bear the burden of complying with the very sort of contract which the statute sought to prevent. Were we to decree the enforcement of such a contract, we would be affirmatively sanctioning the type of infected bargain which the statute outlaws and we would be depriving the public of the protection which Congress has conferred.

*Id.* at 563, 81 S.Ct. at 316.

The statute scrutinized in *Mississippi Valley*, 18 U.S.C. § 208(a), is similar to 18 U.S.C. § 205. Section 205 prohibits any government officer or employee from acting as an agent for any person seeking a government contract. Section 208(a) provides that no government officer or employee may deal in any manner with any organization in which he has a financial interest. The thrust of the two sections are alike; both sections allow the government to disentangle itself from any bargain struck or decision reached involving a government official who may be faced with dual allegiances of such magnitude that the very decision itself is tainted or is perceived to be tainted.

The reason given plaintiff by the VA for the decision not to award it the contract was the appearance of a conflict of interest. The VA wrote the SBA on April 14, 1983 advising the following:

[The VA] has decided not to award the construction contract for this project to Refine Construction Company of New York, New York. The reason for the denial is the appearance of a conflict of interest and possible improprieties in the negotiation process involving Refine Construction Company and an employee of the VA Medical Center, Bronx, New York.

Plaintiff charged that the VA acted arbitrarily and capriciously in refusing to award it the contract because the decision was made not on hard facts but merely on the appearance of impropriety, citing *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed.Cir.1983). That case involved the permanent injunction of the award of a contract to a firm other than the plaintiff. On appeal, the injunction was ordered dissolved on the grounds that the trial judge had erred in finding a violation of the Ethics in Government Act: to wit, the appearance of impropriety by key individuals in the contractor selection process. Plaintiff's argument here follows the same theory addressed by the Court of Appeals in *CACI*. Plaintiff claims that the finding by the VA of an appearance of conflict of interest was arbitrary and capricious and certainly not rational. Plaintiff stated that the assistant to the Assistant Deputy Ad-

---

6. The court does not consider the admonition given in the procurement regulations, 48 C.F.R. § 3.101–1, to avoid conflicts of interest or apparent conflicts, to justify the VA's decision.

7. The court cites *Mississippi Valley* not as authority but as a source of the principle which is in issue.

ministrator for Logistics was charged with investigating the propriety of the proposed award to Refine. The investigation apparently consisted of telephone calls to other VA officers who either did not know the facts or could not discuss them (the Inspector General). The key facts that the VA Deputy Administrator, the final decision-maker, did not have was that (1) Mr. Scott had no confidential information about the project, (2) Mr. Scott was not paid by Refine, (3) Mr. Scott did not attempt to influence his fellow VA employees to favor Refine's proposal, or (4) Refine was told in good faith by Mr. Scott that he had permission from the VA to assist him. The Assistant Deputy Administrator for Logistics who briefed the Deputy Administrator admits having no factual basis for his conclusion that Mr. Scott could influence the negotiations or that Mr. Scott had any special or even general knowledge about the project. Thus, says plaintiff, "it was arbitrary and capricious for (the Assistant Deputy Administrator for Logistics), and by affirmation the VA, to conclude that the contract negotiations were so tainted that the VA had no choice but to revoke the award for Refine." [8]

Defendant did not specifically rebut plaintiff's arguments about the investigation conducted by the assistant to the Assistant Deputy Administrator for Logistics or of the four key facts that allegedly could not have been known by the Deputy Administrator. Instead, defendant stated that the determination to withhold award to Refine was based upon the recommendations of the General Counsel as well as the Associate Deputy Administrator for Logistics, and that the latter officer knew that Mr. Scott was familiar with the project, that Mr. Scott had been involved in other negotiations for the VA, that Mr. Scott was familiar with the manner in which VA negotiates with 8(a) contractors, and noted that one possible reason Mr. Prince had asked Mr. Scott to participate was because of his special expertise. Defendant also argued that *CACI* is inapplicable to the present

situation because the court in *CACI* found that an alleged violation of an agency's conflict of interest regulations cannot justify enjoining a government agency from awarding a contract where the evidence relating to the alleged wrongdoing is based upon suspicion and innuendo. *CACI* at 1581–82. Defendant continued, the VA's findings of impropriety in the case at bar were not based upon suspicion or innuendo, but were founded upon facts that plaintiff cannot refute, *i.e.*, Mr. Scott was a VA employee, he assisted plaintiff in drafting its proposal, he participated in the January 4, 1983 negotiation session, and he had not received prior written approval to do so. Defendant even admits that the Deputy Administrator may not have been aware of the four alleged key facts pointed out by plaintiff but that the facts and the Deputy Administrator's lack of knowledge of them is immaterial because the VA had sufficient facts before it to determine that Mr. Scott had violated "numerous" VA conflict of interest regulations. For example, the Deputy Administrator knew that Mr. Scott had violated the rule that no VA employee could perform services for a contractor or other person involved with the VA without prior written approval, and that was one of his bases for determining not to contract with Refine.

Plaintiff alleged that the information known to the VA did not support its determination and that this court cannot supply the deficient reasoning, citing *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In *Motor Vehicle*, the court stated the following:

> [T]he scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts

**8.** It should be noted that the VA did not "revoke" the award to Refine. Refine was never awarded the contract because the contracting officer never received the necessary concurrences from his supervisors. *See* 41 C.F.R. § 8–1.-403–51 (1983).

found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' *Id.* at 43, 103 S.Ct. at 2867 (citations omitted).

■ After a thorough analysis of a complex record and argument of counsel the court finds that the VA did not act arbitrarily or capriciously in refusing to contract with Refine within the narrow scope of this case. The VA's decision that Mr. Scott acted in violation of 38 C.F.R. § 0.735–19(a) by assisting Refine negotiate the consolidated laundry facility contract at the VA Extended Care Center in St. Albans, New York was rational. The court has no need to supply a "reasoned basis for the agency's action that the agency itself has not given." We do, however, observe that Mr. Scott was also in violation of 18 U.S.C. 205 and Executive Order 11222 § 201(c)(6).

Plaintiff also alleged that it was denied procedural due process because the VA failed to give it timely notice and a hearing before it elected to withhold the contract and formally advertise the procurement. Without citing any authority, plaintiff concluded that a contract award is a property interest protected by the Fifth and Fourteenth Amendments and for defendant to deprive it of that property right without an opportunity to be heard is a deprivation of due process. Plaintiff continued, "[i]f Re-

fine had been accorded its constitutionally protected due process right to a pre-withdrawal hearing, it would have become quite evident to VA officials that Refine had not engaged in any improper activity and that the contract award should be approved."

■ Plaintiff's premise is false. There is no "property right" to the award of a public contract. No citizen has a "right" in the sense of a legal right to do business with the government. *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C.Cir.1964) (citing *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940)). Any rights that arise flow from the contract, not from the expectation of one. In the case at bar, the VA's decision was based on a faulty procurement; the process of awarding the contract had become tainted by Mr. Scott's participation. Neither the VA nor this court has found that Refine was guilty of any impropriety that would justify a decision by the contracting officer that Refine lacked the necessary integrity to be awarded a contract or that Refine was not a responsible offeror. With hindsight it could be said that Refine made a tactical blunder in requesting Mr. Scott's services, but that is of no merit here and now.

Had the VA desired to debar Refine from this and future procurements for a period of time for any reason, Refine most certainly would have been entitled to adequate notice and a hearing as required by the Federal Acquisition Regulations. 48 C.F.R. § 9.407–3 (1986). In the circumstances of this case, plaintiff had no similar right to due process. Refine is not debarred from seeking other contracts with the VA, or with any government agency. In fact, had Refine wished, it could have bid on this very project when it was later formally advertised.

CONCLUSION

Based upon the facts and law set forth above, this court finds that the Veterans Administration did not act in an arbitrary and capricious manner in refusing to contract with Refine, nor was plaintiff entitled to procedural due process. The court holds

that the contracting officer and other VA officials involved in the contract approval process made their respective decisions in a reasonable and rationale manner. Accordingly, defendant's motion for summary judgment is allowed and plaintiff's motion for summary judgment is denied. The Clerk of the court is directed to dismiss plaintiff's Complaint with prejudice. No costs.