Washington, D.C., in a courtroom to be posted in the lobby on that day.

**CELTECH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 644–89C.

United States Claims Court.

Sept. 27, 1991.

Richard Henderson, Landover, Md., for plaintiff.

John Warshawsky, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant; Paula Barton, U.S. Dept. of State, Washington, D.C., of counsel.

## OPINION

MARGOLIS, Judge.

This government contracts case is before the court on defendant's motion to dismiss or, in the alternative, motion for summary judgment or, in the further alternative, motion for partial summary judgment and on plaintiff's cross-motion for summary judgment. Plaintiff asserts that the defendant breached an implied contract to fairly and honestly consider plaintiff's proposal submitted under a government program to develop and assist minority-owned small businesses, and requests damages. Defendant argues that plaintiff fails to state a claim, plaintiff's proposal was fairly and honestly considered, and plaintiff's damages are limited to bid preparation costs. After careful consideration, and after hearing oral argument, this court denies defendant's motions to dismiss for failure to state a claim and for summary judgment on breach of contract, grants defendant's motion limiting damages, grants plaintiff's cross-motion for summary judgment on breach of contract, and denies plaintiff's cross-motion for damages exceeding bid preparation costs.

## FACTS

Plaintiff, Celtech, Inc. ("Celtech") is a small disadvantaged business concern that sells computer and office equipment and provides third-party maintenance. Celtech was a member of the Small Business Administration's ("SBA") Minority Business and Capital Ownership and Development Program ("8(a) program").

The 8(a) program, established pursuant to § 8(a) of the Small Business Act ("the Act"), 15 U.S.C. § 637(a) (1988), is designed to develop and assist minority-owned small businesses. *Harris Systems International*

*al, Inc. v. United States*, 5 Cl.Ct. 253, 255 (1984). Under an 8(a) program, SBA contracts with a procurement agency to provide goods or services. SBA subcontracts these requirements to an 8(a) program participant. SBA then steps aside and permits the 8(a) participant to negotiate directly with the procurement agency. *OAO Corp. v. United States*, 17 Cl.Ct. 91, 93 (1989).

On May 14, 1987, defendant United States, acting through the Department of State ("State"), requested the SBA's permission to negotiate a contract for overseas typewriter repair services with Celtech. State's offering letter to SBA estimated the value of the procurement to be between $800,000 and $1,200,000.

On May 22, 1987, the SBA wrote to State's contracting officer on behalf of Celtech, expressing its desire to contract with State for the typewriter repair services. The SBA requested State to negotiate directly with Celtech for the contract. State was instructed to provide the SBA with a summary of the negotiations and informed that any negotiated agreement would have to be approved by an authorized SBA representative.

On July 20, 1987, State issued a Request for Proposal ("RFP") to plaintiff for typewriter repair services as Solicitation No. 2041–745004. The contract would be classified "TOP SECRET," with a period of performance of one year, and was anticipated to require 22 technicians. State indicated that it needed the services urgently and required proposals by July 31, 1987.

Celtech submitted its proposal on July 31, 1987. Celtech's price for the first year of services was $1,531,186. On September 28, 1987, Celtech revised the proposal, reducing its price to $900,819 for the first year.

On September 8, 1987, after receiving Celtech's initial proposal, State requested the Defense Contract Audit Agency ("DCAA") to audit Celtech's accounting system. On October 27, 1987, DCAA issued audit report No. 6261–8A177.008 stating that Celtech's "accounting system [was] unacceptable for recording costs on

Government contracts." DCAA also sent a letter to Celtech on October 27, 1987, that detailed the audit results. DCAA indicated that it was essential to correct the accounting system deficiencies immediately, and "[f]ailure to do so [could] result in a determination that [Celtech's] ... accounting system [was] not adequate for the recording, accumulating and billing of costs on ... Government contracts/subcontracts."

On November 24, 1987, State's Office of Inspector General for Audits ("OIG/AUD") informed State's contract administrator of the DCAA audit results. In light of Celtech's accounting system problems, the OIG/AUD stated that "[u]ntil the contractor has implemented an acceptable accounting system no contract should be awarded to the contractor." The letter indicated that, because the contract required labor, the timekeeping deficiencies described in the DCAA report were particularly important.

Based on a discussion with State's contract administrator, DCAA evaluated Celtech's September 28, 1987 revised proposal, and issued audit report No. 6261–8A210.-019. In the accompanying letter, the DCAA Branch Manager noted that the audit results were qualified because results of the technical evaluation were not available. DCAA also found that "the cost or pricing data submitted by [Celtech] were inadequate in some respects." However, DCAA "consider[ed] the proposal to be acceptable for negotiating a price." (Emphasis added).

While State negotiated with Celtech on the proposed contract, State also inquired whether other contractors could provide the services. For example, on December 3, 1987, State's Assistant Director of Small and Disadvantaged Business Utilization ("SDBU"), informed Martinez Business Center of Denver, Colorado that SDBU had recommended it for the typewriter services contract. In addition, State apparently contacted at least one other firm, Pulau of Chatsworth, California, regarding the potential contract.

On December 16, 1987, Celtech sent a letter to DCAA detailing the new proce-

dures for employee time records that it had implemented pursuant to DCAA's October 27, 1987 audit report. Celtech advised DCAA that it was "presently drafting the necessary modifications in order ... to be in complete compliance with all of [DCAA's] recommendations."

On February 12, 1988, DCAA wrote Celtech that its "accounting system [was] structured in a manner that [was] acceptable for the accumulation, segregation and recording of costs under Government contracts." DCAA also indicated that all of the deficiencies it identified previously were corrected and, with the exception of the job cost ledger, were fully implemented. DCAA said it would perform a follow-up review of the job cost ledger.

On February 28, 1988, the OIG/AUD informed State's contracting officer that DCAA had "accepted Celtech's revised accounting system for recording costs under Government contracts." However, on March 23, 1988, State informed the SBA that it was withdrawing its offer to the SBA for Celtech's services based on accounting system deficiencies identified in the October 27, 1987 DCAA audit.

On May 4, 1988, the SBA informed Celtech that State decided to withdraw the Celtech offer. The SBA explained its belief that:

the State Department should have provided the Small Business Administration with timely formal notification of the results of the DCAA's audit of Celtech's bookkeeping system. Timely notification would have given the District Office an opportunity to provide Celtech Inc. with 7(j) management assistance to correct any deficiencies in Celtech's financial record-keeping system that may have been cited in DCAA's audit report.

On July 20, 1988, State informed Celtech that it would not award a contract on Solicitation No. 2041–745004.

In October 1988, Celtech filed a claim with State's contracting officer, seeking $219,994.89 in "contract costs" based on an alleged implied-in-fact contract to perform the typewriter repair services. The con-

tracting officer issued no decision, and Celtech sought an Armed Services Board of Contract Appeals ("ASBCA") order directing a contracting officer's decision. The ASBCA denied Celtech's request for relief on August 23, 1989. *Celtech, Inc.*, ASBCA No. 38219–423, 89–3 B.C.A. (CCH) ¶ 22,240, 1989 WL 109855 (1989). Celtech did not appeal the ASBCA decision.

Celtech filed the present action on November 28, 1989. Celtech seeks damages of $219,994.89 as compensation for preparing and revising its proposal, hiring consultants, changing its accounting system, preparing security clearances, and hiring, retaining, and training employees.

## DISCUSSION

*Failure to State a Claim*

■ The government argues that plaintiff fails to state a claim upon which relief may be granted. According to the government, the duty to fairly and honestly consider a proposal arises only in the context of competitive bidding. In the non-competitive 8(a) program environment, the government contends that the law does not recognize an implied contract for fair and honest consideration of a single proposal. This court disagrees, and holds that the law recognizes such a claim.

*Refine Construction Co. v. United States*, 12 Cl.Ct. 56 (1987), considered a claim for breach of an implied contract brought by a disappointed bidder in the non-competitive 8(a) context. *Id.* at 64.[1] Plaintiff, a contractor selected by the SBA for an 8(a) contract, submitted a bid to construct a Veterans Administration (VA) facility. *Id.* at 58. After contract negotiations began, the VA learned that plaintiff's representative in the negotiations was a VA employee. *Id.* The VA decided not to award plaintiff the contract due to a conflict of interest. *Id.* Plaintiff sought to recover bid preparation costs, alleging that

the government violated its duty to fairly and honestly consider its bid when it decided not to award it the contract. *Id.* at 64.

The *Refine* court found jurisdiction and held that the government has the duty to consider all bids fairly, even those submitted in the non-competitive 8(a) environment. *Id.* As the court stated, "the government impliedly obligated itself to treat [the plaintiff's] proposal fairly, which would include acceptance of the proposal in the absence of any serious intrinsic or extrinsic factors that would require denial of the contract." *Id.* at 64.

*Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 71, 140 F.Supp. 409, 413 (1956) (construing *United States v. Purcell Envelope Co.*, 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919)), announced the proposition that a bidder has the right to have its bid honestly considered, not wantonly disregarded by the government. In upholding jurisdiction for implied contracts involving disappointed bidders, the *Heyer* court focused primarily on the government's favoritism and discrimination between bidders which made a sham of the bidding process. *See id.* 135 Ct.Cl. at 68–70, 140 F.Supp. at 412–13.

Despite this focus, "*Heyer* stated a broad general rule which is that every bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, ... the injured party has the right to come into court to try and prove his cause of action." *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970) ("*Keco I*"). *Keco I* confirmed that "any party who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation [has] standing to sue." *Id.* 192 Ct.Cl. at 779, 428 F.2d at 1237.

*Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) ("*Keco*

---

1. [A]n implied-in-fact contractual relationship between a bidder and a procuring agency ... arises when an agency invites a contractor to respond, submit a bid, to an invitation or solicitation to perform work or render service. When such a bid is submitted, pursuant to an

invitation or solicitation, an implied-in-fact contractual relationship is created that the bid will be fairly and honestly considered by the procurement agency.

*Data Transformation Corp. v. United States*, 13 Cl.Ct. 165, 171 (1987).

*II*"), stated that the "ultimate standard" for assessing fair and honest consideration is "whether the Government's conduct was arbitrary or capricious toward the bidder-claimant." *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203. *Keco II* identified four general principles that control all or some of these claims: (1) subjective bad faith on the part of procuring officials; (2) lack of any reasonable basis for the administrative decision; (3) degree of discretion that applicable statutes and regulations give to procurement officials; and, possibly, (4) proof that pertinent statutes or regulations were violated. *Id.* at 574, 492 F.2d at 1203–04. The court added that "[t]he application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor." *Id.* at 574, 492 F.2d at 1204.

The government, citing *New American Shipbuilders, Inc. v. United States,* 871 F.2d 1077 (Fed.Cir.1989), asserts that an implied contract to consider bids applies only in competitive bidding situations, based on the premise that the rule protects only against a "sham" procurement where there is favoritism or discrimination between bidders. *See Heyer,* 135 Ct.Cl. at 68–70, 140 F.Supp. at 412–13. However, *New American Shipbuilders* is distinguishable from the facts of our case. The United States Court of Appeals for the Federal Circuit, in dictum, concluded that enforcement of an implied-in-fact contract does not extend to a claim for a discretionary grant, where the equities are different from the normal procurement process. *Id.* at 1080 (dictum) (citing *Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493 (1978)). The court's reference to *Tree Farm,* a case which held that *Heyer* does not extend to the award of discretionary grants, strengthens this interpretation.

This reading of *New American Shipbuilders* is consistent with *Heyer* and its progeny. The government's reading, on the other hand, is inconsistent with *Heyer's* statement of the government's duty to fairly and honestly consider bids. Restricting the duty to competitive situations is contrary to the rationale for *Heyer's* broad general rule: to guard against arbitrary and capricious consideration of offers by providing every bidder with a legal remedy if the government breached its obligation to consider an offer fairly and honestly. *See Keco I,* 192 Ct.Cl. at 780, 428 F.2d at 1237. Arbitrary and capricious behavior encompasses more than favoritism or discrimination between competing bidders. The principles enunciated in *Keco II* embrace conduct such as bad faith, failure to make decisions on a rational basis, and violation of pertinent statutes and regulations, which may occur in either competitive or non-competitive situations. *Keco II* acknowledged, for example, that a violation of procurement regulations could "follow from the defendant's failure to pursue the established procedures in selecting an awardee in a small business or labor surplus area set-aside." *Keco II,* 203 Ct.Cl. at 578, 492 F.2d at 1206 (dictum).

Consistent with *Heyer* and the *Keco* cases, this court holds that the law recognizes a cause of action for breach of the implied contract to fairly and honestly consider a proposal submitted under the 8(a) program. "[T]he government impliedly obligated itself to treat the proposal fairly, which would include acceptance of the proposal in the absence of any serious intrinsic or extrinsic factors that would require denial of the contract." *Refine Construction Co.,* 12 Cl.Ct. at 64. Thus, Celtech states a claim upon which relief may be granted.

*Fair and Honest Consideration*

The government breached the implied contract to fairly and honestly consider Celtech's proposal because State failed to refer to the SBA its determination that Celtech was not responsible, as required by the Small Business Act and implementing regulations. *See* 15 U.S.C. § 637(b)(7)(A); *see also* 48 C.F.R. §§ 9, 19 (1987). The government advances three arguments against this conclusion. First, the government seems to contend that an 8(a) concern is not a "small business concern" for purposes of the Act and regulations. Second,

the government asserts that regulations requiring the procuring agency to refer contractor responsibility determinations to the SBA do not apply to 8(a) concerns. Third, the government argues that the Certificate of Competency ("COC") program applies only to competitive procurements.

*8(a) Participant as a "Small Business Concern"*

■ The government argues that "[t]he major flaw in Celtech's position is that Celtech treats small businesses and 8(a) program contractors as though these categories are synonymous. In fact, there are substantial differences." *Defendant's reply memorandum at 13.* Although not identical, 8(a) concerns are a *type* of small business concern.

The FAR, which implements the acquisition-related sections of the Small Business Act, includes the 8(a) program for small disadvantaged business concerns within its scope. 48 C.F.R. § 19.000(a)(6). The FAR defines a "small disadvantaged business concern" as:

> a *small business concern* that is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged, or a publicly owned business having at least 51 percent of its stock owned by one or more socially and economically disadvantaged individuals and has its management and daily business controlled by one or more such individuals.

48 C.F.R. § 19.001 (emphasis added); *see also* 13 C.F.R. § 124.1(a)(2).

Eligibility for participation in the 8(a) program requires the applicant to qualify as a small business concern. 13 C.F.R. § 124.102(a). Procurement assistance regulations for small business concerns, such as the Certificate of Competency ("COC") program, state that small business concerns "include[ ] small concerns owned and controlled by socially and economically disadvantaged individuals...." 13 C.F.R. § 125.2(c).

An 8(a) participant is both a "small disadvantaged business concern" and a "small business concern" for purposes of the FAR and the SBA regulations. 48 C.F.R. § 19;

13 C.F.R. §§ 124, 125. Therefore, Celtech is a small business concern, as well as an 8(a) firm, under the applicable regulations.

*Applicability of Certificate of Competency Program to 8(a) Concerns*

■ The government argues that certain procedures mandated for small businesses by the Act and applicable regulations are not required for 8(a) concerns. According to the government, the COC program does not apply to 8(a) program participants.

The COC program requires the procuring agency negotiating with a small business to refer to the SBA any determination that the business is not responsible to perform the particular contract. Once a procuring agency notifies the SBA that a small business concern lacks certain elements of responsibility, the SBA must inform the business of the agency's determination and give it the opportunity to apply for a COC. 48 C.F.R. § 19.602-2(a); *see* 48 C.F.R. § 9.104-1 (listing elements of responsibility). If the business applies for and receives a COC from the SBA, the agency's contracting officer must award it the contract. *See* 48 C.F.R. § 19.602-4(b). If the SBA denies the prospective contractor's request for the COC, the procuring agency's determination that the prospective contractor is not qualified to perform the contract stands. *See* 48 C.F.R. § 19.602-4(c); *see also* 48 C.F.R. §§ 19.602-1(a)(1), 19.602-2(c)(1).

"The COC program empowers the Small Business Administration (SBA) to certify to Government contracting officers as to all elements of responsibility of *any* small business concern to receive and perform a specific Government contract." 48 C.F.R. § 19.601(b) (emphasis added). Therefore, COC's may be issued for 8(a) program participants because 8(a) participants are "small business concerns." 48 C.F.R. § 19.602-2.

SBA has the power and duty, when necessary, to certify to government procurement officers a small business concern's responsibility, including its capability, competency, and capacity to receive and perform a specific government contract. 15

U.S.C. § 637(b)(7)(A). The procurement officer may not preclude the small business concern from contract award without referring the matter to the SBA for final disposition. *Id.* The SBA has the final say on responsibility determinations for all small business concerns. *See also* 13 C.F.R. § 124.1(a)(3) (allowing the SBA to provide technical or management assistance to qualifying small businesses, including those eligible under § 8(a) of the Act). COC program eligibility requirements do not preclude 8(a) concerns from taking advantage of the program. 13 C.F.R. § 125.5.

█ The government maintains that "the prospective contractor's competency to perform is not reviewed by the SBA, *unless* contract negotiations are successful and result in the procuring agency proposing to SBA that the 8(a) program participant be awarded a contract." *Defendant's motion to dismiss at 19.* (Emphasis in original). However, if procurement officers were not required to refer a responsibility determination to the SBA prior to terminating negotiations, the SBA could be precluded from furnishing assistance to the business. The business is entitled to this assistance under the Act. SBA's assistance could eliminate the cause for termination and qualify the business to perform the required services. Accordingly, the government's argument that procurement officers need not refer adverse responsibility determinations involving 8(a) concerns to the SBA is unpersuasive.

The government cites 13 C.F.R. § 124.301(c)(5) in support of its argument that the competency of prospective contractors is not reviewed by the SBA unless contract negotiations are successful. However, the situations that call for a "Certification of SBA's Competency" are distinct from those that require a COC, although both involve SBA assessments of the qualification of prospective contractors to perform Government contracts. *Compare* 13 C.F.R. § 124 *with* 48 C.F.R. § 19.6.

A Certification of SBA's Competency acts as the SBA's final stamp of approval for a contract following successful negotia-

tions between a procuring activity and an 8(a) concern. 13 C.F.R. § 125.5. COCs, in contrast, are used when negotiations between the procuring agency and the 8(a) concern break down. The Certification of SBA's Competency is necessary because small disadvantaged business concerns providing services to the government through the 8(a) program act as subcontractors on SBA's contracts with the procuring activity. The assessment of a small business concern's competency required for a Certification of SBA's Competency does not require a special investigation or the issuance of a COC. 15 U.S.C. § 637(b)(7); 13 C.F.R. § 124.100(b).

*Applicability of COC Program to Noncompetitive Procurements*

█ The government argues that the COC regulations in 48 C.F.R. § 19.6 apply only to competitive procurements. To the contrary, through the COC program, SBA may certify an otherwise qualified small business concern as an eligible government contractor under the Walsh–Healey Public Contracts Act, which applies to § 8(a) contracts. 48 C.F.R. §§ 19.601(c), 22.603.

At the time of the Celtech solicitation, 8(a) contracts could be awarded on a noncompetitive basis. Thus, contractors could seek COC's when negotiating with government agencies on non-competitive procurements. The government's argument that the COC program is limited to competitive procurements is unavailing.

█ Therefore, Celtech, as a small business eligible for the COC program, was entitled to have State notify the SBA prior to terminating negotiations on the non-competitive procurement. Celtech would then have had an opportunity to apply for SBA assistance in curing perceived deficiencies, and may have ultimately qualified for contract award.

*Regulatory Violation as a Basis for Recovery*

*Keco II* stated that "proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery." *Keco II*, 203 Ct.Cl. at 574, 492 F.2d

at 1204. The degree of deference accorded to the conduct of procurement officers depends on the discretion entrusted to them by applicable statutes and regulations. *Id.* In this instance, Celtech's ground for recovery is the mandatory referral requirement for nonresponsibility determinations detailed in the FAR.

■ The FAR states that "[i]f a small business concern's offer that would otherwise be accepted is to be rejected because of a determination of nonresponsibility, the contracting officer *shall* refer the matter to the Small Business Administration, which will decide whether or not to issue a Certificate of Competency (see Subpart 19.-6)." 48 C.F.R. § 9.104–3(e) (emphasis added).

A limited exception to this mandatory referral requirement, 48 C.F.R. § 19.602–1(a)(2)(i) does not require the contracting officer to refer its determination to the SBA if the officer determines that the business is unqualified because it does not meet the standard in 48 C.F.R. § 9.104–1(g). This particular subsection states that a prospective contractor must "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations." Other subsections list specific responsibility requirements for prospective contractors. 48 C.F.R. § 9.104–1(a)–(f). In particular, one subsection specifically states that prospective contractors must "[h]ave the necessary organization, experience, *accounting and operational controls,* or the ability to obtain them...." 48 C.F.R. § 9.104–1(e) (emphasis added).

The government determined that Celtech was not responsible to perform the typewriter repair services contract because a "[DCAA] audit report of October 27, 1987 found Celtech's *accounting system to be unacceptable* for recording costs on Government contracts." (Emphasis added). State's cited reason for withdrawing the offer to Celtech through the SBA falls squarely within the "accounting and operational controls" requirement of 48 C.F.R. § 9.104–1(e), not within the "otherwise qualified" requirement of 48 C.F.R. § 9.104–1(g). Thus, the exception to the

mandatory referral requirement does not apply, and the government violated 48 C.F.R. § 9.104–3(e).

■ Even if the exception applied, the Government violated § 9.104–3(e) because the decision not to refer the matter to the SBA must be approved by the chief of the contracting office. 48 C.F.R. § 19.602–1(a)(2)(i). There is no evidence that the chief of the contracting office approved the decision.

■ Normally, the government must be accorded significant deference in applying procurement regulations. *See Refine Construction Co.,* 12 Cl.Ct. at 64–65 (citing *Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 188, 193 (1983)). However, in this case, the FAR removed all discretion from procurement officers. *See* 48 C.F.R. § 9.104–3(e). The contracting officer failed to notify the SBA about State's determination that Celtech was not responsible to perform the typewriter repair contract, thereby violating 48 C.F.R. § 9.104–3(e). This regulatory violation prejudiced Celtech because it deprived Celtech of the opportunity to apply for a COC and, possibly, to be awarded the contract. This court holds that the government's regulatory violation breached the implied contract to fairly and honestly consider Celtech's proposal under the 8(a) program, entitling Celtech to recovery.

*Damages*

■ Celtech seeks recovery of all costs associated with bid preparation and "gearing up" to perform the contract. The government argues that Celtech's recovery should be limited to its bid preparation costs. *AT & T Technologies, Inc. v. United States,* 18 Cl.Ct. 315 (1989). This court agrees.

In *AT & T Technologies,* a disappointed bidder sought to recover costs of preparing its bid and proposal ("B & P"), as well as costs allegedly incurred in reliance on the RFP. *Id.* at 319. The court limited plaintiff's damages to its bid preparation costs, reasoning that the solicitation, as the genesis of the implied contract between the

government and bidders, defines the scope of the government's duty to fairly and honestly consider bids. *Id.* at 321. However, the solicitation's terms are not necessarily incorporated in the implied contract:

"[o]nly those terms governing the activities of contractors prior to award form the implied-in-fact contract. Other terms governing later stages of the contractual relationship, such as those specifying performance requirements, are for the most part irrelevant during the pre-award period, and thus cannot be said to be part of the implied-in-fact contract."

*Id.; see Keco II,* 203 Ct.Cl. at 573, 492 F.2d at 1203; *Keco I,* 192 Ct.Cl. at 785, 428 F.2d at 1240; *Contract Custom Drapery Service, Inc. v. United States,* 6 Cl.Ct. 811, 819 (1984); *see also New America Shipbuilders,* 871 F.2d at 1079 (dictum); *Refine Construction Co.,* 12 Cl.Ct. at 64. Accordingly, Celtech's damages in this case are limited to its bid preparation costs.

## CONCLUSION

The law recognizes a claim for the government's breach of a duty to fairly and honestly consider a proposal under the 8(a) program. As a matter of law, this court finds that: 8(a) concerns are "small business concerns" for purposes of the Small Business Act and the implementing regulations; the COC program applies to 8(a) concerns; the COC program applies to both competitive and non-competitive procurements; and the FAR requires contracting officers to refer nonresponsibility determinations for 8(a) concerns to the SBA. It is undisputed that the contracting officer in this case did not refer the nonresponsibility determination to the SBA. Based on the violation of this mandatory referral requirement, this court holds that the government breached the implied contract to fairly and honestly consider Celtech's proposal. Longstanding case law limits Celtech's damages to its bid preparation costs.

Defendant's motion to dismiss for failure to state a claim is denied. Defendant's motion for summary judgment regarding breach of contract is denied. Defendant's motion for summary judgment limiting damages is granted. Plaintiff's cross-motion for summary judgment for breach of contract is granted. Plaintiff's cross-motion for summary judgment with respect to damages, except for bid preparation costs, is denied. The parties shall stipulate to Celtech's bid preparation costs and submit a stipulation to the court within 45 days from the date of this opinion.